Turley, J.
delivered the opinion of the court.
This is an action of ejectment in which the plaintiff claims title under the will of Anthony Bledsoe, deceased. This will was made and published by the testator in the county of Sumner, State of Tennessee, on the 21st day of July, 1788, and its execution attested by James Clendening, Thomas Murray, and Hugh Rogan, and it was duly *273 proven and registered in the County Court of Sumner.
This will is in the words and figures following:
“ In the name of God : Amen. Being near to death, I make my will as follows: I desire my lands in Kentucky to be sold, likewise my lands on Holston, at the discretion of my executors. My children to be educated in the best manner my estate will permit; my estate to be equally divided among my children; to each of my daughters a small tract of land. My wife to keep possession of the four oldest negroes for the maintenance of family. My lands and slaves to be equally divided amongst my children. I appoint my brother, Isaac Bledsoe and Colonel Daniel Smith executors, with my wife, Mary Bledsoe, executrix. At the decease of my wife, the four above negroes to ' be equally divided amongst my children.”
Polly Weatherhead, the lessor of the plaintiff, is a daughter of Anthony Bledsoe, the testator, and claims an interest in the land in dispute as a devisee, under the will, the land having constituted a portion of the estate of said Anthony at his death.
Upon the trial, a certified copy of the will was offered in evidence to be read upon its probate and registration in the County Court of Sumner. To this the defendants objected, and suggested as reason therefor, that a fraud had been committed in the drawing or obtaining the will, and that there were irregularities in the execution and attestation thereof. Wherefore, they insisted upon the production of the original.
The original was then produced; whereupon the defendants, with the view to impeach the validity of the will, and the right of the lessor of the plaintiff to deraign title through it, introduced Mary Read, a witness who proved that she was the daughter of Isaac Bledsoe, the brother *274 of Anthony Bledsoe, the testator; that her father and his brother, with their families, resided in the year 1788, in a fort at Bledsoe’s Lick, in Sumner county; that her father and family occupied one end of the house, and Anthony Bledsoe and family the other; that, on the night of the 20th July, 1788, about midnight, the Indians placed themselves in ambuscade near the fort, in such a position as to fire into the passage which divided the house; that a portion of them rede rapidly by the house, upon which Anthony Bledsoe and his negro man, named Campbell, rushed into the passage, and were immediately shot down by the ambuscading Indians, the negro being instantaneously killed, and Anthony Bledsoe shot through the body near the navel with a large musket ball. It was at once known that this wound was mortal. He was drawn into the room, and the witness, together with her father and mother, went in immediately to see him. He was laboring under the most excrutiating pain, and it was believed that he must die in a short time, and he did die about sun-up next morning. Witness further says that her mother, after ascertaining that Anthony Bledsoe must soon die, observed to her father’, Isaac Bledsoe, that if he died without making. a will, his daughters would inherit none of his land as the law then stood, and that his estate consisted chiefly of lands ; that they ought to talk to him, and get him to make a will, and give his daughters a piece of land. Isaac Bledsoe, concurring in opinion with his wife, they both went to Anthony Bledsoe, and told him he must die, and that if he did, his daughters would get none of his real estate unless he made a will, and suggested to him the propriety of doing so, and giving to his daughters some land; to which he replied, that he would make a will if any body would write it; and said he wanted his Kentucky and *275 Holston lands sold to raise and educate bis children; that his daughters should have a small tract of land to be assigned them by his executors, the balance of his lands for his sons, the negroes for his wife for life, and then to be equally divided among his children. Witness further says that James Clendening wrote the will, that she saw him writing it, and heard Anthony Bledsoe giving out to him, but did not understand what he said. She does not recollect whether or not the will was read over to him after it was written. She thinks he could understand a matter presented to him directly; but, from his great pain and suffering, she thinks he was not in a condition to detect errors or mistakes, or make a will with reason and. judgment. The deceased left at his death five sons and six daughters, and another daughter was born after.his death.
She further says that her father as executor of the will allotted to the four eldest daughters and husbands in 1793, what was thought to be their portions of the real estate of Anthony Bledsoe; and that, in 1801, there was assigned a like portion by commissioners to Polly Weatherhead, (the plaintiff’s lessor,) and her husband, James Weatherhead, and that the sons of Anthony Bledsoe held the balance of said real estate of Anthony Bledsoe from the date of said allotment in 1801.
The defendants also introduced and read in evidence the deposition of Margaret Desha, who proved that Anthony Bledsoe was her uncle; that she was with him at the time of his death; that he made a will; that it was written by James Clendening; that she has always been of the impression that by the phrase “ a small tract of land, ” as used in the will, her uncle intended to bequeath to his daughters, individually, something like a half pre-emption, or three hundred and *276 twenty acres, and that he also designed that they should have an equal portion of the personal estate.
B. Rogan was also introduced by the defendants, and proved that in a conversation .between his father, Hugh Rogan, and Peter Fisher, he heard his father say that Anthony Bledsoe left by his will a small tract of land to his daughters, the balance of his lands to his sons* except the Kentucky and Holston lands, which were to be sold.
Hugh Rogan was a subscribing witness to the will, and proved its execution in the County Court of Sumner.
General Hall, a witness for the defendants, also proved that, in a conversation with Hugh Rogan, he said to him that Isaac Bledsoe had told him in the presence of his wife, she agreeing thereto, that when they discovered that Anthony Bledsoe must die, they suggested to him the propriety of making a will, to get him to give his daughters a piece of land, for that, if he died without a will, his daughters would get none of his real estate-, as the law then stood; upon which he said if any body would write his will he would make it. That James Clendening wrote it, and that it was to the effect that his Kentucky and Holston lands should be sold by his executors, and the proceeds applied to raise and educate his children; that his daughters should have a small tract of land assigned them at the discretion of his executors, and the balance of his lands to his sons ; that the four negroes were to be his wife’s for life, and at her death they and the balance of his personal property to be equally divided among his children. Witness then asked Rogan if that statement was correct? To which he replied, “that it was correct,'or about the way of it.” Rogan was dead at the time this testimony was given by the witness.
This witness also proved that Isaac Bledsoe and the *277 widow of Anthony Bledsoe as executor and executrix of the will of Anthony Bledsoe, in the year 1793 laid off to the four oldest daughters and their husbands four separate tracts of land out of the estate of Anthony Bledsoe, each of which was designed to contain three hundred and twenty acres of land; but, in reality contained about four hundred. That they went into possession thereof immediately thereafter, expressed themselves to be well satisfied, claiming nothing more of the real estate of the testator. Afterwards, the two youngest daughters, one of whom was married to a man by the name of Sewell, and the other the lessor of the plaintiff, who was married to James Weatherhead, became of age, and the County Court of Sumner county appointed General Hall and others commissioners to lay off a tract of land out of the estate for each of them, which they did, about four hundred acres each.
James Weatherhead and wife lived on the portion assigned to them till they sold it, and in the year 1826, moved out of the State.
All the foregoing proof was objected to by the plaintiff.
The witness Hall also stated that he heard the lessor of the plaintiff say, fifteen years ago, that she was dissatisfied with the manner in which the real estate of Anthony Bledsoe was divided, and that she intended to sue for her portion of it.
It farther appeared in proof that the lessor of the plaintiff continued from the date of her marriage in 1799, which was anterior to the adverse, possession of the defendants to be a feme covert till within a period less than three years before the commencement of this suit.
This is all the proof in the cause necessary for raising the questions debated, and upon which the court charged the jury substantially as follows: “Witnesses had been *278 examined with a view to prove that the clause in Anthony Bledsoe’s will, which directed his lands and negroes to be equally divided among his children, was inserted in the will through fraud, mistake or inadvertence ; that the testator had not directed such a clause to be inserted, but that his instructions were that his lands should be equally divided between his sons, except a small tract to each of his daughters, and that the parol proof introduced was relied upon to prove that such were the testator’s instructions.” As to the competency of this proof, in view of this question, the court said: “If the clause objected to had been written according to the instructions given by the testator, or if, after it was thus written, the testator himself had read it over, or if any other person had read it to him as it was written, and he signed the will with the knowledge that the word children had been inserted instead of the word sons, the proof was incompetent to shew that the testator meant sons and\ not children. But if the word children was inserted in the will by the draftsman, when the instructions were to insert sons, or that when the testator signed the will, he. believed the word sons and not .children was inserted in it, it presented a very different case, and parol proof might be introduced to show that the will was written contrary to the intention of the testator, or read to him differently from what it was written ; but the parol proof must be confined to the question, whether the paper pi’oduced is the last will and testament of the testator, in the devise of his real estate, or whether there be any clause inserted in such paper, through mistake, fraud, inadvertency, or accident, contrary to the instructions or wish of the testator, and not extended to show what meaning and design the testator had in using the language employed.”
*279 The court further said, “ that, the parol evidence given for the purpose allowed must be a detail of facts coming within the personal knowledge of the witnesses who had given testimony in this cause, and not what the witness may have heard others say. That one of the witnesses, General William Hall, had been interrogated as to what Mr. Rogan (one of the subscribing witnesses to the will,) had told him in relation to its contents, that this had been allowed by the court only for one purpose, and that it was legal only for that one purpose, viz, the purpose of impeaching or weakening the evidence of that individual as a subscribing witness to the will, and which had been proved by him together with the other witness, and admitted to probate in the County Court of Sumner; that he had sworn that the paper produced was the will of Anthony Bledsoe, or at least it was presumed he had so sworn, and if he stated to the witness, Hall, that it was his understanding that Bledsoe, when he made his will, directed that it should be so drawn as to give all his lands to his sons equally, with the exception of a small tract to each of his daughters. This statement would impeach his evidence given as a subscribing witness, but would be no proof that such directions were given by the testator.”
The court also said “ that any statement made by witness, Hall, as to what Isaac Bledsoe and his wife told him took place at the time the will was made, was to be laid aside by the jury as not being evidence in the case for any purpose whatever.”
The court also said, “ that it was proper for the jury to examine the different provisions of the will, particularly the clause directing the daughters tp have a small tract of land, with the view of seeing whether the will itself, upon its face, offered any evidence, that the subsequent *280 clause which directs his land and negroes to be equally divided between his children, was inserted contrary to the design and directions of the testator, through fraud, mistake, accident, or inadvertence.”
The court also said, “ that, if the daughters and sons-in-law of the testator acquiesced in the division of the land between the sons, after the death of the testator, without complaining, and expressed satisfaction or thankfulness for the liberal provision made for the daughters, this was a circumstance proper to look to, in considering whether the clause objected to was inserted in the will by mistake or fraud.”
In the case as thus presented under the proof and charge of the court in relation to the law thereon, several questions are now presented for our consideration and determination :
1st. As to the power of the court upon the suggestion of fraud committed in the drawing or obtaining the will, or irregularity in the execution or attestation thereof, to compel the production of the original, and the practice consequent thereon. By the common law the validity of a will of real estate is cognizable in the courts of common law, and in the ordinary forms of suits and the verdict and judgment are conclusive upon the parties and privies as in other cases, and therefore, upon the trial of an issue of devisavit vel non, or other issue of title to land under a will in the courts of common law, it was necessary to produce the original will, if it were in existence, and prove its execution by the subscribing witnesses. When this was done, the burden of attack was thrown upon those resisting it, and they might bring forward for that purpose any proof which would be legal for the purpose of showing that it was not the will of the *281 testator, or that the party claiming interest under it was not provided for by it. This made it necessary for the claimant under the will to be always prepared to prove it, whenever it became necessary for him to resort to it for his protection. This, in practice, would frequently be found productive of much inconvenience, not to say injustice — especially, in new and thinly inhabited countries, with a migratory population. And, with a view to this, the act of 1784, ch. 10, was passed by the legislature of North Carolina, which provides, by section 6, “ that all probates of wills in the County Courts shall be sufficient testimony for the devise of real estate, and attested copies of such wills, or the records thereof by the proper officer, shall and may be given in evidence in the same manner as the originals, provided, where any fraud may be suggested to have been committed in the drawing or obtaining any last will, or any irregularity in. the execution or attestation thereof, the party making such suggestion shall and may insist upon the original will being produced to the court, if the same is to be found; and the court wherein any suit is pending, and in which such will may be introduced as testimony, may compel all and every person or persons whether in office or otherwise to produce the same.”
Now, what change has this statute wrought upon the common law in relation to this subject, as it existed anterior to its passage ? It has made a probate of the will in the County Court sufficient testimony for the devise of real estate, and attested copies evidence in the same manner as the originals. We have seen that, previous to the statute, the original, if in existence, had to be produced, and when produced, it had to be proven; but now an attested copy may be substituted in the place of the original, and be retid upon the probate in the County Court. *282 Suppose this done. In what position do the parties then stand ? In the same that they would have stood provided the original will had been produced and proven as is required by the common law; that is, the party claiming under the will has made out his ease prima facie, and those claiming against the will, are put upon their de-fence to show that it is no will, or that the party producing it takes no interest under it. The only difference then is, that an attested copy of the will, with the probate in the County Court, is substituted in the place of the original will and proof in open court, per testes. But it was never intended that such attested copy, with the probate in the County Court, should be conclusive, as is the probate of a will of personal property, per testes, in solemn form, in the courts having jurisdiction of such probates, that being looked upon as a proceeding in rem.
The pi’oviso to the statute was intended for the protection of those contesting the will, in order to give them the benefit of any internal evidence upon the face of the will tending to show that a fraud had been committed in the drawing or obtaining it, or that there was any irregularity in the execution or attestation thereof. Then we hold upon this point that where a will for real estate has been proven in common form, and registered in the County Court, an attested copy thereof is competent proof, prima fade, for any person claiming an interest under it, in any suit pending at law in relation to land devised by it; that the defendant may attack the validity of such will, and the rights of those claiming under it, as well and to the same extent, where an attested copy is relied upon, as where the original is produced and proven in common law form upon the trial, and that the person resisting the claim under the will is entitled to the production of the original if it be *283 in existence, and be thinks it will facilitate his defence; but before he can ask forthis, he must suggest that a fraud has been committed in the drawing or obtaining the will, or that there is some irregularity in the execution or attestation thereof.
Then the court committed no error in keiuing proof on the part of the defence in this case, attacking the validity of the will, and the rights of the lessor of the plaintiff under it, provided the proof be legal, the reception of which was warranted by the law of evidence.
This brings us to the second inquiry. Is the proof which was received on the trial of this case in the Circuit Court legal proof?
This branch of the case subdivides itself into two propositions. First: whether the hearsay testimony of Hugh Rogan, a subscribing witness to the will, as detailed by the witnesses, B. Rogan and Gen. William Hall, is legal evidence in this case; and, Second, whether the evidence as to the intention of the testator to leave his lands to his sons, with the exception of a small tract to ea.ch of his daughters, as the same has been adduced, is legal for the purpose of changing the phraseology of his will, so as to insert the word sons, in the place of the word children; or for the purpose of striking out the clauses by which his real estate is devised to his children, and thus leave him intestate as to all his lands, other than the small tracts disposed of to his daughters, whereby his sons will take by inheritance the great mass of his real estate ?
1st. Is the hearsay evidence of Hugh Rogan legal evidence? We think most clearly upon principle, that it is not. The circuit jadgc held that it was only legal for one purpose, that of impeaching or weakening the evidence of Rogan, whom he holds, as a subscribing witness'to the will, *284 to have sworn in the estimation of the law upon the probate in the County Court, that the paper produced was the will of Anthony Bledsoe, and whose testimony to this effect he holds to be impeached by his admissions, that at the time the will was executed, certain instructions were given by the testator for the preparation of the will, which were not pursued by the draftsman, and from which it may result that the paper proven is not the testator’s will in law. Strange reasoning this! The witness, says the judge, has sworn that the paper proven in the County Court was the will of Anthony Bledsoe. He was a bold witness if he so swore. He must have sworn to the law as well as to the fact. It is not the signing of the will that necessarily makes it the will. It may very well be signed and published as a will, and yet be no will. It is so contended in this very case ; for this will was signed, published, and attested in all due form, and yet it is most strenuously contested and insisted upon that it is not the will of Anthony Bledsoe; and yet the judge of the Circuit Court will hold that Rogan swore that it was his will, and that he is to be discredited by his statements and admissions; that certain things took place in relation to its execution which, in law, forbid it tobe considered his will. The reasoning of the judge upon this subject is too refined and metaphysical; and, moreover, it assumes the existence of the fact upon which the legality of the hearsay proof rests, viz, that the paper purporting to be the will of Anthony Bledsoe was not his will; the very fact then under examination, and in support of which the hearsay testimony was received. The assumption is, not only that Rogan swore that the paper was Bledsoe’s will, but that, in point of fact, it was not; for, if it were, then Rogan had sworn truly, and there is nothing to impeach his testimony. If the jury had found that the paper was the will of Bledsoe, then the hearsay testimony of Rogan *285 was illegal; otherwise not. This is absurd. The judge had in his mind a different case altogether, we apprehend. If Rogan had sworn in the County Court that he saw Bledsoe execute the paper as his last will and testament, and it could have been proven that he had been afterwards heard to say that he never saw him sign it, then there would have been much reason in the position to have been then assumed in favor of the validity of the proof.
In point of fact, Rogan can only be held to have sworn upon the probate of the will in the County Court, that he saw Bledsoe sign, or heard him acknowledge it; for this is all the law requires upon such probate. A witness is never asked in such case to swear that it is the will of the testator. Indeed, a witness, at the time of his attestation, need not know any thing of the contents of the will.
Swinburne considers it an advantage of a written testament that the testator has thereby an opportunity of concealing the contents from the witnesses, which he cannot do when he makes a nuncupative will. For, says he, (after enumerating many of the motives which may rationally influence the testator to keep those in expectancy ignorant of his last disposition,) “ in these and the like cases after the testator has written his will with his own hands, or procured some other to write the same, he may close up the writing without making the witness privy to the contents thereof;” nor, continues he, “ is the instrument the less available because the witnesses do not know what is contained inthe same, in case they be able to prove the identity of the writing.” Swinburne on Wills, part 1, sec. 11.
And this is equally so, says Mr. Roberts in his treatise upon the statute of Frauds and Perjuries, 309, since that statute as before. This shows how absurd it would be to ask a witness to swear to any thing but the signing *286 and publication of the will. If he knows not the contents, he can swear to nothing in relation to them.
This error of the judge no doubt prejudiced ■ this case very greatly with the jury, for it was the means of getting before the jury the statement of Isaac Bledsoe and his wife in relation to the intention of Anthony Bledsoe to bequeath his lands to his sons and not to his children, and- although he instructed the jury that they were not to regard these heresay statements as substantive proof of the fact to which they related, and only to look upon them in connection with admissions made by Rogan in relation thereto, as effecting his credibility as a subscribing witness; yet, knowing how human nature is constituted, we can well see that the judge -had as well have said to the wind,' “don’t blow,” and have expected it would have obeyed him, as to have supposed that the jury could have freed themselves from the bias which the heresay statements of the brother and sister of the testator, who were present when the will was made, and whose remonstrances and intercessions procured it, and which had been detailed to them by the venerable General Hall, was so well calculated to produce.
Strike out of this proof the statements of Isaac Bledsoe and wife, and the hearsay evidence of Rogan, all of which is clearly illegal, and there is no proof of the testator’s intention to leave his lands to his sons, and not to his children, save that of Mrs. Read, and it would be found exceedingly difficult, upon her uncorroborated proof, considering her age at the time the transaction took place, and all the circumstances attending it, to establish the fact that the,yvord children was substituted in the will for the word sons, and that this was done in violation of the directions of the testator, and that he signed the will without being- *287 aware of this, and supposing that the word sons had been introduced in pursuance of instructions.
This reverses the judgment which has been rendered in this case in the court below, and here we might rest it, but, inasmuch as the case depends, in a very great degree, upon the proper solution of the second proposition of this branch of the subject, we will proceed to discuss it notwithstanding its inherent difficulties.
2d. Is the evidence as to the intention of the testator to leave his lands to his sons, with the exception of a small tract to each of his daughters, as the same has been adduced, legal, for the purpose of changing the phraseology of the will, so as to insert the word sons, in the place of the word children, or, for the purpose of striking out the clauses by which his real estate is devised to his children, and leave him intestate as to all his lands, other than the small tracts devised to his daughters, whereby his sons will take by inheritance the great mass of his real estate ?
Before entering into a discussion of this, subject, let us ascertain with precision what the proof really is upon the-subject — the intent of it, and the value of it, freeing the case from all irrelevant and illegitimate evidence which has served to obfuscate it, and confuse the mind in relation to it. It has been seen that we exclude from the consideration of the case all the proof relating to the statements said to have been made in relation to the transaction by Hugh Rogan, and all' the statements of Isaac Bledsoe and wife, as detailed by General Hall. This then leaves ■nothing but the proof as given by Mrs. Mary Read to be considered of; the testimony of Margaret Desha, amounting to nothing but her own impressions as to the proper construction of the will and the intentions of the testator, and as such are of no value whatever. Mrs. Read, as we *288 have heretofore stated in this opinion, proves that her father and mother suggested to Anthony Bledsoe the propriety of making a will in order to give his daughters some land, to which he replied that he would make a will if any body would write it, and that he wanted his Kentucky and Holston lands sold to raise and educate his children; that his daughters should have a small tract of land to be assigned them at the discretion of his executors, the balance of his lands for his sons, and the negroes for his wife for life, and then to be divided equally amongst his children; that the will was written by Clendening; that she saw him writing it, and heard Anthony Bledsoe dictating it, but did not understand what he said, and that she does not know that the will was read over to him after it was written. This is the substance of her proof in relation to this transaction, and amounts in still fewer words to this and no more: “ a short time before the will was written, she heard the testator say he wanted his daughters to have a small tract of land, the balance for his sons.” And it is now proposed, upon this proof, materially to change the will, which directs his estate, both land and negroes, to be equally divided among the testator’s children, either by striking out the word children, and inserting the word sons, or by striking out the Avhole clause of the will, as having been made against the testator’s instructions, and inserted without his knowledge; and, therefore, constituting no part of the will. Can this be done 1 that is the question. The power of courts to hear parol testimony, to contradict, add to, or explain written instruments, has been a fruitful theme of discussion in the courts of Great Britain and the United States. The books are full of adjudged cases upon the subject. They are compli eated, and, in but too many instances, contradictory in their *289 principles, and it is exceedingly difficult to arrange and har-monise them. Such an attempt, in our opinion, would not only be impossible, but be absurd. We design no more than to make such an examination as will enable us to lay down a few general principles upon the subject — such as, in our judgment, will be sufficient for the determination of the case under consideration; and, in doing so, we shall confine ourselves principally to cases of wills.
Mr. Roberts, in his treatise upon the statute of Frauds and Perjuries, page 308, says: “The loose constructions of the statute of wills affording such facilities to designing persons of practicing upon the weakness of men on the bed of sickness, or of forging testaments and supporting them by perjury when the lips of the party were closed forever, invited the legislature to interpose some additional guards for the protection of these last and most interesting dispositions of property. By the statute of 29th Charles 2d, ch. 3, it was, therefore, enacted that all devises and bequests of any land or tenements devisable either by force of the statute of wills, or by that statute) or by force of custom, shall be in writing, signed by the party so devising the same, or by some other person in his presence, and by his exprsss directions, and shall be attested and subscribed in the presence of said devisor by three or four credible witnesses, or else they shall be utterly void and of none effect.”
This statute, it has been held, is not in force in this State; but, then, most of its provisions are rc-enacled in different statutes passed by the legislature of North Carolina and Tennessee, and that in relation to wills by the act of 1784, ch. 22, sec. 11, which provides as follows: “Whereas, wills and testaments, which ought to be the most solemn and best considered acts of a man’s life, are, *290 in too many instances, tbe most indiscreet, and from weakness of body and mind, and tbe undue influence of those about them, and from an omission of due ceremonies, the true intentions of the testator are frustrated, and injustice done to those for whom he meant especially to provide. No last will or testament shall be good or sufficient, either in law or equity, to convey or give any estate in lands, tenements, or hereditaments, unless such last will shall have been written in the testator’s Iiie-time and signed by him or some other person in 'his presence and by his direction, and subscribed in his presence by two witnesses at least, no one of whom shall be interested in the devise of said lands.”
This is a re-enactment of the statute of 29th Charles II upon this subject; and, therefore, the decisions of the English Courts in relation to the execution and proof of wills under that statute, are to be considered of great weight in investigations of a like character under our statute.
Seeing with what anxiety the disposition of real estate by will is guarded against frauds and mistakes — with what form and ceremony wills' for that purpose are required to be executed — it is not to be wondered at, but on the contrary to be expected, that any attempt to add to, subtract from, or vary them, when once so executed, by parole testimony would be looked at with extreme jealousy and greatly discouraged. And so we accordingly find it.
The same excellent elementary writer before quoted, Mr. Roberts, ip the same work, at page 10, observes: “But, though the ceremonies of writing and signing háve in a multitude of cases been made necessary by the statute of frauds, and the law, since the passing of the act, has entertained a greater jealousy of any attempts to add to *291 or alter the effect of a written instrument by parol testimony, yet the common law, in laying so much stress upon the consideration of contracts, has not overlooked the propriety and importance of guarding the chastity of written instruments; and it was held before the act of Chai’les the II superadded its positive restraint, that a writing, whether under seal or not, was not to be added to, controlled, or contradicted by unwritten words.
Thus, it. was observed by Justice Dyer, in Britt vs. Regden, Plow. Com., 345, “ that men’s deeds and wills, by which they settle their estates, are the laws which private men are allowed to make, and they are not to be altered even by. the king in his courts of law or conscience. We must take it as we find it.”' And it was said, since the statute, by Lord Hardwick, in 2d Atk., 384, “ that it is not only contrary to the statute, but to common law to add any thing to a written agreement by parol evidence.”
The same author says further in continuance: “ The statute of 29th Charles the II has enhanced the duty of caution in, admitting verbal testimony to add to .or alter written instruments in the cases falling within its provisions. And it should seem, that if at common law when writing was not necessary to the validity or proof of the contract, courts were so cautious of permitting parol evidence to vary or control its import, a more abundant reason for the same caution arises out of the statute of frauds, which has rendered certain contracts remediless at law without writing.”
Another excellent elementary writer, Mr. Jarmon, in his treatise upon wills, vol. 1, page 349, says: “ As the law requires wills both of real and personal estate, (with an inconsiderable exception.) to be in writing, it cannot consistently with this doctrine permit parol evidence to be ad *292 duced, either to contradict, add to, or explain the contents of such will. And the principle of «this rale evidently demands an inflexible adherence to it, even where the consequence is the partial or total failure of the testator’s intended disposition, for it would have been of little avail to require that a will ah origine should be in writing, or to fence a testator round with a guard of attesting witnesses, if, when the written instrument failed to make a full and explicit disclosure of his scheme of disposition, its deficiencies might be supplied, or its inaccuracies corrected, from extrinsic sources. No principle connected with the law of wills is more fully established, or more familiar in its application, than this; and it seems to have been acted upon by the judges as well of early as of later times with a Cordiality and steadiness which shows how entirely it coincided with their own views. Indeed, it was rather to have been expected that judicial experience should have the effect of impressing a strong conviction of the evil of offering temptation to perjury.”
The remarks of these elementary authors are so just, so consonant with reason and a correct administration of justice, and so well supported by authority, that we quote them with decided approbation. It is not, however, to be understood, that no such evidence is, in any case, to be admitted, for it has long been held too late, so to say; for in repeated instances the judges have been called upon for the exercise of a sound discretion in establishing sound criteria for its rejection or admission; and, accordingly, divers exceptions have been made to the general rale excluding such testimony; but great caution has always been observed in the creation of these exceptions, and in their application, experience having most generally shown that any serious departure from a strict adherence to the *293 requirements of the statute, has been productive of mischief and not unfrequently of regret on the part of courts that it had been allowed. It is not, therefore, to be expected that this court will create any new exception to this general rule, or that it will not be strict in the application of those which have already been made.
It is not our design to attempt to show what these exceptions are, which have been allowed by the courts upon this subject, for it would require a treatise to do so, and we only intend to specify such as are or may be considered as applicable to the case now under consideration, and also a few principles adjudged not to be exceptions to the rule, and which we think may be necessary for the elucidation of the subject.
Mr. Roberts, in his treatise before referred to, page 11, says: “ The rule of distinction commonly resorted to in these cases, turns upon the tendency of such evidence to contradict, vary or add to, or only to explain and elucidate an instrument. A rule very good and intelligible, and if not universally of easy application, yet fully adequate to the solution of a great majority of the cases. Its application is well illustrated in the case of King vs. The Inhabitants of London, 8 Term Rep., 379. The question in this case was, whether the written agreement should be considered as a contract of hiring and service, or a contract of apprenticeship, such agreement not having the word apprentice in it, but beginning with the following words: ‘“I, J. M., do agree with J. C. to serve him three years to learn the business of a carpenter.” The court permitted parol evidence to show that the pauper paid a premium to be taught the trade, and was not to be employed in any other work than that of a carpenter. For this parol evidence was not offered to contradict the *294 written agreement, but to ascertain an independent fact, the instrument being equivocal without that explanation.
But the case of Hampshire vs. Pierce, 2d Vesey, 216, determined at the rolls by Sir John Strange, sets this distinction in perhaps a clearer light than any other to be found in the books. It is, in substance, as follows: A testatrix by her will gave two legacies, the one of 100Z., the other of 30OZ., in the following manner: “ I give and direct 1001. to be paid by my trustees to the four children of my late cousin, Elizabeth Bamfield, equally to be divided between them; if any or either of them should happen to die under twenty-one, or unmarried, their share or shares shall go to the survivors of them.” The other legacy was worded as follows: “I further give unto the children of my late cousin, Elizabeth Bamfield, 3001.” At the time of making the will, there were two children of Elizabeth Bamfield by Poddlccomb, her first husband, and four by Bamfield, and all the six survived the testatrix. It was insisted that parol evidence should be read to show that the testatrix meant the four children by the second' husband in both the above-mentioned bequests. But the Master of the -Bolls observed, that the two parts of the case fell under quite a different consideration: that he had always taken the distinction, as to admitting parol evidence, to be, that in no instance it should be admitted in contradiction to the words of the willbut, if the words of a will were doubtful and ambiguous, so that unless some reasonable light were let in, it would fall to the ground, any thing to explain not to contradict the will, was always admitted. As to the 1001. legacy, there were six children, and though it were not material whether they were by one husband or another, yet it was a proper ground to admit an explanation upon as to what four *295 children were meant. But, as to the 300Z., the devise was so expressed as to take in the whole of the children, the will was positive as to that, and there was no ambiguity at all.
Parol testimony is admissible to explain ambiguities; but in analogy to the principle on-which parol evidence is admitted to explain, but not contradict or enlarge the import or expression of an instrument of writing, a distinction runs through the cases between latent and patent ambiguities.
Mr. Roberts, at page 15 of his work upon the statute of frauds, defines a latent ambiguity to be, where the equivocality of expression, or obscurity of intention does not arise from the words themselves, but from the ambiguous state of extrinsic circumstances to which the words of the instrument refer, and which is susceptible of explanation by the mere development of extraneous facts, without altering or adding to the written language, or requiring more to be understood thereby than will fairly comport with the ordinary or legal sense of the words and phrases made use of. He defines a patent ambiguity to be one produced by the uncertainty, contradictoriness, or deficiency of the language of an instrument, • so that no discovery of facts, or proof of declarations, can restore the doubtful or smothered sense without adding ideas which the actual words will not themselves sustain. And he observes that it follows from this explanation that the statute of frauds, which, in~this particular, is declarative and corroborative of the rule of the common law, virtually forbids, in the cases within its provisions, the resort to extrinsic proof in those instances wherein the ambiguity is patent, and only admits it in those cases in which the ambiguity is latent; and, in such cases, the object of the collateral *296 testimony is only by a comparison of the words of the instrument with external circumstances, whether consisting of facts or declarations, to attach a meaning and applicability to expressions within the limits of their grammatical or legal acceptation. The statute seems in no danger of violation by the admission, for these purposes, of this species of evidence.
The instances most frequently chosen as examples of a latent ambiguity are in relation to the person and the thing: as if there be a devise to a person of the same name, with another without any specification appearing upon the face of the will to designate the real object of the testator’s bounty, — this is a latent ambiguity as to the person. If a testator devise his manor of S. to A. B., and has two manors, North S. and South S. this is a latent ambiguity as to the thing. As these ambiguities are generated by facts, so they may be removed by a further investigation of facts or matter extrinsic. But if these ambiguities occur in the wording of the will, producing a palpable uncertainty upon its face, extrinsic evidence cannot remove the difficulty, without putting new words into the mouth of the testator; which in effect would be to make a will for him.
It is not intended to insist that the distinction thus drawn and the practice upon it, is of universal application, for, as has been observed by the same author so frequently quoted, page 20, N. 9, “Though the ambiguity which is raised by a state of facts dehors the instrument is called a latent ambiguity, and that which is produced merely by the words of the instrument is denominated a patent ambiguity and it is generally said with truth that the species of ambiguity last mentioned excludes and the former admits parol and extrinsic evidence: yet, *297 upon a close attention to the examples in the books we shall find that the discriminating line is very difficult to be drawn in many instances, and we shall be forced to allow that there is an ambiguity answering to the terms of the description of a latent ambiguity which nevertheless partakes of the character and consequences of an ambiguity patent.
Thus, if by reference to external circumstances the intention of the framers of or parties to an instrument is not only thrown into doubt, but the language used becomes irreconcilable and contradictory, so as to become incapable of expressing any intention with certainty: this sort of ambiguity, whether denominated patent or latent is such as will not yield to any evidence of extraneous and collateral declarations.
So it must be allowed that the rule of admitting parol evidence in the case of an ambiguity latent, and rejecting it when offered to expound an ambiguity patent, becomes, to use Mr. Roberts’ words, a little unsteady in its application. For where a testator gives a legacy to Mr. G. parol evidence is admissible to show who Mr. G. is, and it is not easy to show that tire ambiguity, which this imperfect description creates, is not an ambiguity arising upon the face of the will, and as such an ambiguity patent.
And I think, continues Mr. Roberts, that it will be more for the credit of legal consistency, instead of straining by any refinement of reasoning, to take such case out of the description of an ambiguity patent, to allow that the rule is flexible to the extent of admitting extrinsic evidence in a few particular cases where the ambiguity though patent arises from something short in the expression or designation of the objects of the testator’s intention and is of a nature calculated to receive an easy explanation.
*298 This is as much as we deem it necessary for this case, to say, in relation to the reception of parol proof, to explain ambiguities.
There is also another class of cases which it becomes necessary to notice to a certain extent in which extrinsic evidence is admitted to prevent fraud and correct mistakes.
Fraud is a subject of relief in equity, and a bar at law, to which no solemnities of authentication can be opposed, and the anxiety of courts of judicature to prevent its success, has, when its existence is the object of proof, made extrinsic and parol evidence admissible; and indeed the steps by which the courts have progressively proceeded in subjecting written instruments to the control of parol proof are said to have had their commencement in fraud. Roberts on Frauds, 78. Proof extrinsic, will, therefore, be received to show that the testator had been led into the error by the fraud and designing misrepresentation of persons attending his sick bed. On this principle the evidence offered in the case of Small vs. Allen, 8th Tenn. Rep., 147, was admitted and suffered to prevail.
The facts of that case are these: the testator having already made a will, nevertheless, at the request of some interested person, consented to make a fresh will, and one being proposed and presented to him for execution, he desired to be informed, whether that which he was called upon to execute, was the same as the former, and upon being told that it was, he subscribed it: but the second will appearing to be materially different from the first, it was set aside upon the evidence of these circumstances of imposition upon the testator.
So in the case of Hippesly vs. Homer, Turn, and R., 48, where a testator by his will, dated in 1800, devised his estate to certain limitations, by a codicil made in 1804, after *299 empowering one of the devisees for life to make a jointure and charge portions for children, made certain variations in the' limitations of his will and gave certain additional powers of management to his trustees. The bill charged that the testator executed the codicil upon the representation and in the belief that it contained nothing but powers to the devisee for life to make a jointure and charge portions of children, and prayed that it might be set aside. The facts charged were admitted by the answer. Issues were directed. First, as to whether the testator did, by a paper writing, purporting to be a codicil to his will, devise in manner following: (then follow the words of the codicil by which only the powers of jointuring and charging portions were conferred). Secondly, whether the testator did, by said codicil, devise in manner following, (here was set forth the remaining part of the codicil). The jury found that the part of the codicil which was the subject of the second issue, did not constitute the will of the testator, and that part of the codicil which was the subject of the first issue, did constitute the will of the testator. Whereupon the court declared that so much of the codicil as did not constitute the will of the testator was void.
So much for cases in which parol evidence will be received though there be a written instrument. None further need be specified for this case as we think.
Let us now specify a few in which it will not be received. In the case of Strode vs. Lady Faulkland, 3 Chan. Rep., 98, letters and oral declarations of the testator were offered to prove the intention to include a reversion-in the words, “all other my lands, tenements, and hereditaments out of settlement,” and it was unanimously agreed by the Lord Chancellor, Lord Chief Justice, and the Master of the Rolls, that this kind of evidence could *300 not be admitted, for that where a will was doubtful and uncertain it must receive its construction from the words of the will itself, and no parol proof or declaration ought to be admitted out of the will to ascertain it.
So, in the case of Brown vs. Selwin, Cas. Temp. Talb., a testator bequeathed the residue of his estate to two persons, whom he appointed his executors, and one of them was indebted to him by bond, it was attempted to prove, by the evidence of the person who drew the will, that he received the testator’s instructions to release the bond debt by the will, but that he refused to do so under the impression that the appointment of the obligor to be one of the executors relinquished the debt. Lord Talbot held the evidence to be inadmissible, and his decree was adarmed in the House of Lords. See also the case of Lord Walpole vs. The Earl of Cholmondeley, 7 Dur. and East., 138.
So parol evidence is not admissible to supply any clause or word which' may have been inadvertently omitted by the person drawing or copying the will. The Earl of Newburgh vs. The Countess of Newburgh, 5 Madd. 364.
So evidence to shew that by an inadvertent phrase in the will the testator has made a provision contrary to his real intention, would probably be rejected. Roberts on Frauds, 78.
This is- as much of the law, upon this subject, as we deem necessary to advert to. It will be seen that it embraces two classes of cases, one in which the parol testimony is received or rejected in cases of construction of wills, such as proof to explain ambiguities or to give a different meaning to words and phrases used in the will from their common acceptation to supply a clause or word which may have been inadvertently omitted by the person *301 who drew the will; the other in which the parol testimony is received upon an issue of devisavit^ vel non, or upon a trial at law involving that -issue, and has been offered for the purpose of proving, that the will or some clause of it had been procured by a fraudulent imposition upon 'the testator, or that the clause or clauses had been introduced into the will inadvertently and contrary to the intention and instructions of the testator, and that, therefore, the instrument so executed was not the will of the testator.
Now it must be borne in mind that where the testimony is received for the purpose of giving a construction to the will, the proof is heard by the court and determined upon by the court, as it is the duty of the court to construe the will, but when the proof is upon an issue of devisavit vel non, it is to be heard by the jury whose duty it is to determine the question of will or no will.
Let us now apply the testimony of Mary Read to these principles of law, and see whether upon any of them it is available for the defence.
It will be recollected that she says she heard the testator, Anthony Bledsoe, before the will was written, say, that he wished his daughter to have a small tract of land, the balance for his sons. Can this testimony be received to alter the will so as to strike out the word children, and insert the word sons? Certainly not upon the authority of the case of the Earl of Newburgh vs. The Countess of Newburgh.
Can it be heard to explain the ambiguity in the will? Certainly not. Upon all the authorities upon the subject, and because it is not a case of ambiguity in its proper sense as it seems, but a case of a devise being partially void for uncertainty.
If we strike out of the will that portion of it which *302 gives to his daughters a small tract of land, there is no ambiguity either latent or patent, — the will is sensible.
That clause we think must, upon authority, be struck out as being void for uncertainty. In the case of Bowman vs. Millbank, 1 Term, 130, a devise in the words, “I give all to my mother,” was held void for uncertainty.
So a bequest by a testator that a handsome gratuity' should be given to each of his executors, is void for uncertainty. Jubber vs. Jubber, 9 Sim., 503. So when, the intended subject matter of disposition consists of an indefinite part or quantity, the gift necessarily fails for uncertainty. On this principle a bequest of some of the best of my linen, has been held to be void. Peck vs. Halsey, 2nd P. W., 3 874, Dow., 145; 1 Jarmon on Wills, 317-18.
There then is no ambiguity. But lastly, if there were ! upon an ambiguity the question is one of construction, and in this case the proof has been sent to a jury as if it were an issue of devisavit vel non.
Can the proof be heard to alter the meaning of the word children, upon the ground that it was inadvertently used for the word sons 1 We think clearly not upon any principle.
Can it be heard to shew that the will was procured by fraudulent misrepresentation and'suppression of the testator’s intention! We think not; — for there is no pretence of such fraud or suppression. Can it be heard to shew that the will was written contrary to the testator’s intention and instructions, and that he signed it under a mistaken supposition that it had been drawn as he desired ,and directed! We think not; — because the proof does not shew what instructions, if any, were given for the drawing of the will; the witness merely saying upon this branch *303 of the subject that she saw the draftsman writing and heard the testator dictating, but did not know what he said. She does not even know whether the will was read to him after it was written. How then can it be said that it is a case in which the testator signed under a mistaken belief that his will had been written in pursuance of his intentions and instructions, when it was entirely different ?
In the case of Hippesly vs. Homer the charge of such mistake and misapprehension was expressly made in the bill and admitted in the answer.
To permit wills to be changed and materially varied upon such loose proof of intention, would not only be in our opinion in violation of all authority, but would be destructive of the safety of all persons claiming under wills, and would open the door to perjury and fraud, which it would be found difficult to close.
Then we think that upon any point in which this case can be viewed, the judgment of the Circuit Court is erroneous, and must be reversed, and the case remanded íor a new trial.