# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
September 7, 2007 Session

## DR. VICTOR W. HORADAM v. SUE STEWART, EXECUTRIX OF THE ESTATE OF ANDRE ALICE NORTON AND THE ESTATE OF ANDRE ALICE NORTON

**Appeal from the Chancery Court for Rutherford County**
**No. 05-1205MI      Robert E. Corlew, III, Chancellor**

_____

**No. M2007-00046-COA-R3-CV - Filed October 6, 2008**

_____

Executrix appeals the trial court's interpretation of language from decedent's Last Will and Testament. Decedent was a well-known author of science fiction literature and the rights to that literature comprise a significant portion of her estate. Beneficiary under Will sought construction specifically of his bequest granting "the royalties from all posthumous publication of any of my works[.]" The trial court held there was a patent ambiguity in the Will precluding extrinsic evidence of intent. Executrix objected and made an offer of proof of decedent's intended use and meaning of the terms "copyright," "royalties," and "posthumous publication." The court found decedent used "copyright" and "royalties" interchangeably and intended Beneficiary to have both the copyrights and posthumous royalties from all of her works.

Based on the language in the four corners of the Will, we agree there was an ambiguity in the Will but have determined it was latent, rather than patent, and we reverse the trial court on its ambiguity finding. Accordingly, the consideration of extrinsic evidence of the decedent's intent and the circumstances surrounding the execution of the Will is permitted and is necessary for the proper administration of the estate. After careful review of the record including Executrix's proffered evidence of decedent's intent, we have determined that the decedent intended different meanings of the terms "copyrights" and "royalties" and we reverse the court's determination that those terms were used interchangeably. In doing so, we award the copyrights not previously bequeathed in the Will to Executrix and the royalties, as defined in this opinion, to Beneficiary. In view of the circumstances of this case, we affirm the decision of the trial court that Executrix should be removed as executrix of the estate and an administrator ad litem appointed. Judgment of the trial court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Reversed in Part; Remanded**

JEFFREY F. STEWART, SP.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., J., joined. PATRICIA J. COTTRELL, P.J., M.S., not participating.

Dicken E. Kidwell, Murfreesboro, Tennessee, for the appellant, Sue Stewart.

Wm. Kennerly Burger, Murfreesboro, Tennessee, for the appellee, Dr. Victor W. Horadam.

## OPINION
### I. BACKGROUND

Petitioner Dr. Victor Horadam filed a "Complaint for Construction of Will and for Appointment of Administrator with Will Annexed" against Respondent Sue Stewart seeking an interpretation of the Last Will and Testament of Andre Alice Norton. The Will at issue named Dr. Horadam as a beneficiary of a specific bequest and appointed Sue Stewart as Executrix of Ms. Norton's estate. Ms. Stewart, along with her husband, was also named the beneficiary under the residuary clause. The provisions of the Will relevant to the issues before us read as follows:

> **SECOND**, I give devise and bequeath the following property, real, personal and mixed to the following persons, to wit:
> . . . .
>     H. To the following individuals, I give the copyrights of the books upon which the following were collaborators with me, to wit: To Mercedes Lackey . . . **Elvenbane Elvenblood, and Elvenborn**; To Pauline Griffin . . . **Redline the Stars**, and **Fire Hand**; To Sherwood Smith . . . **Derelict for Trade**, **A Mind for Trade**, **Echoes in Time** and **Atlantis Endgame**; To Sasha Miller . . . **To the King a Daughter**, **Knight or Knave**, **A Crown Disowned** and **Dragon Scale Blade**.
> . . . .
>
> **FIFTH**, To Victor Horadan [sic], MD, 6054 Aberdeen, Dallas, Texas, 75230, I give my blue notebook containing the listing of all of my books, the royalties from all posthumous publication of any of my works, and all of the trophies, plaques, etc., which I have received during my writing career.
>
> **SIXTH**, All the rest and residue of my property, I give to Sue Stewart and husband, Ollie Stewart, who have faithfully cared for me over an extended period of time.

Specifically at issue is the "FIFTH" paragraph which must be interpreted to determine the decedent's testamentary intent of what exactly constitutes "the royalties from all posthumous publication of any of my works. . . ."

The underlying facts of this case are largely undisputed. Andre Alice Norton was an accomplished and internationally known science fiction author of over 130 novels and over 300

literary titles in all. Her career spanned more than 70 years during which time she wrote fantasy fiction, both independently and in collaboration with other writers. She was one of the first successful women authors of science fiction, reaching an international audience to international acclaim, and helped pioneer the way for women in the male-dominated field of science fiction literature. Her work has been developed into other artistic mediums including the well-known *The Beast Master* series. In the early eighties, Andre Norton was honored by the Science Fiction and Fantasy Writers of America with the prestigious Grand Master Award for lifetime achievement in science fiction and/or fantasy.

Ms. Norton was a very private and generous person. She had no close relatives but rather a number of close associates and friends. In 1998, she moved from central Florida to Murfreesboro, Tennessee to live out the remaining years of her life. Soon thereafter, she was introduced to Sue Stewart by Rose Wolf, Ms. Norton's assistant. Ms. Stewart became employed as Ms. Norton's general caretaker, responsible for Ms. Norton's physical care and housekeeping, among other things.

As her assistant, Rose Wolf handled Ms. Norton's literary and business needs. She lived upstairs in Ms. Norton's home and cared for her in the evenings. In early 2004, Ms. Norton and Ms. Wolf had a falling out at which time Rose Wolf was relieved of her duties as described by the trial court:

> In February of 2004, [Ms. Stewart] started working without any income because Rose Wolf had told Ms. Stewart that Ms. Norton was in serious financial trouble, but Ms. Stewart found out that wasn't the case. There was testimony that Ms. Norton didn't want Ms. Wolf there because of financial issues, and that Ms. Wolf struck Ms. Norton in the face with a document which was her letter of resignation. Ms. Wolf had previously had a Durable Power of Attorney, which privilege was later given to Ms. Stewart.

After Ms. Wolf left, Ms. Stewart assumed responsibility for all of Ms. Norton's business needs in addition to her existing care taking duties. Ms. Norton executed a new Durable Power of Attorney on April 15, 2004, giving Ms. Stewart broad discretion over Ms. Norton's affairs and property, including the power to oversee her literary rights and business. Ms. Norton continued to write, and she relied on Ms. Stewart to communicate with publishers, agents, and attorneys and assist her with these affairs.

Because of her advancing age, Ms. Norton purchased a truck she could more easily access primarily for Ms. Stewart's use to drive her to doctor's appointments. Although Ms. Stewart was responsible for the maintenance of the vehicle and used it as her own, Ms. Norton paid approximately $14,000.00 for the vehicle and titled it in Ms. Stewart's name. Eventually, Ms. Norton sold her home and moved in with the Stewarts instead of buying another house at the age of 92. Ms. Norton paid to build a sizeable addition to the Stewarts' home which became her residence complete with a kitchen, bedroom, bathroom, and living room. It is unclear exactly how much the addition cost, but there was testimony that Ms. Norton transferred as much as $250,000.00 to Ms. Stewart to pay for the construction as well as Ms. Norton's medical expenses

and other bills. It is undisputed that Ms. Norton trusted Sue Stewart in all her affairs, both personal and professional, and that the two had a very close personal relationship.

The Petitioner, Dr. Victor Horadam, is an oncologist who lives in Dallas, Texas. He began reading Andre Norton's novels at a young age and, over the next 25 years, he developed a close, personal relationship with Ms. Norton founded on admiration and inspiration. The two exchanged hundreds of letters over the years and remembered one another on occasions and holidays with cards and sometimes gifts. Dr. Horadam personally visited Ms. Norton a number of times in Orlando, Florida and in Murfreesboro. Dr. Horadam even donated his oncological services and provided the treatment for one of Ms. Norton's friends.

Several years before Ms. Norton's death, Dr. Horadam purchased a collection of Ms. Norton's books and diaries for $45,000 and another personal book collection for $7,500 through Ms. Norton's book dealer. Aside from these purchases, Dr. Horadam had no financial or business dealings with Ms. Norton, they never discussed her Will, and he "had no clue" he was a beneficiary in her Will. Ms. Stewart on the other hand was directly involved and entrusted with attending to Ms. Norton's finances and career. Just before her death, Ms. Norton transferred all of her literary rights in an unfinished fantasy novel referred to as Taste to Ms. Stewart for $1 on February 24, 2005.

Ms. Norton died at the age of 93 on March 17, 2005 leaving a Last Will and Testament (hereinafter referred to as the "Will"), which was executed December 31, 2004. The rights to her literary works comprise the most significant assets of the estate. The Will first directed the payment of her debts, and it then made specific bequests, including the copyrights to her co-authors. Ms. Norton forgave certain debts owed her, including a loan made to Ms. Stewart for her son's college tuition. Ms. Norton appointed Ms. Stewart as the executrix of her estate "in all aspects, including the gathering of all of my literary property and other property, be it real, personal or mixed, the payment of all of my just debts, and the distribution of all property in accordance with this my Last Will and Testament."

Dr. Horadam filed the petition on August 17, 2005 seeking the court's interpretation and construction of the fifth paragraph as set forth in Ms. Norton's Will. Dr. Horadam specifically requested "a finding that the description of the bequest is clear in expressing the intent of the Testatrix, but lacks certainty and precision in defining the meaning of what types of publications (regarding both location and media format) are within the intent of the Testatrix." He also asked the court to appoint a disinterested party to substitute as executor or administrator of the estate in lieu of Ms. Stewart.

A significant amount of witness testimony was introduced at trial, including that of Dr. Horadam, Sue Stewart, and Attorney Jerry Scott,[1] scrivener of Ms. Norton's Will. Mr. Scott

---

[1] The Honorable Jerry Scott now serves as a Senior Judge for the State of Tennessee but at all times relevant to the instant action, served as counsel for Ms. Norton; we therefore refer to him as "Mr. Scott."

testified by deposition about drafting several versions of Ms. Norton's Will as well as her participation and instruction in developing the final document. Dr. Horadam presented an expert on copyright law and Ms. Stewart offered experts in the field of literary publishing, each providing opinion testimony on the meaning of the words at issue. She also proffered a number of witnesses who testified that Ms. Norton expressed her intent to leave everything to the Stewarts prior to her death.

After a two day trial, the court held by Memorandum Opinion filed November 6, 2006, that the decedent used the words "copyrights" and "royalties" interchangeably in her Will. Based on this determination, the court found Dr. Horadam was entitled to receive all of the copyrights and royalties from the publication of any of Ms. Norton's works that inured to the decedent's estate following her death. The court also ordered that a substitute executrix or administrator be appointed to replace Ms. Stewart based on its ruling and the circumstances of the case. Ms. Stewart appeals.

## II. ISSUES ON APPEAL

The preliminary issue on appeal is whether Ms. Norton's bequest of "the royalties from all posthumous publication of any of my works" is ambiguous. If so, we must decide whether the ambiguity was a patent ambiguity, which precludes extrinsic evidence, or whether the ambiguity was a latent ambiguity, which permits extrinsic evidence of a testator's intent. The Chancellor determined there was an ambiguity and ruled that the ambiguity resulting from "posthumous publication" was a patent ambiguity rather than a latent ambiguity. Stated simply, we must determine the meaning of "posthumous publication" as used in the Will and what exact bequests were given in the Will. Recognizing the difficulty in interpreting whether the provision presented a patent or latent ambiguity, the court permitted Ms. Stewart to present witnesses, only as an offer of proof, to testify concerning Ms. Norton's intent.

Ms. Stewart appeals the court's decision to exclude the extrinsic evidence of Ms. Norton's intent arguing in favor of a latent ambiguity and claims there was insufficient evidence to support the verdict as a result. Ms. Stewart's position is that Dr. Horadam is to receive only those royalties from Ms. Norton's works that are initially copyrighted and published after her death and that Ms. Norton intended to leave the remaining copyrights and royalties from works previously published to Ms. Stewart and her husband under the residuary clause of the Will.

Dr. Horadam argues that he is entitled to all royalties generated from the sale, publication, or reprint of any of Ms. Norton's works after her death. Dr. Horadam asserts Ms. Norton would not allow the most valuable assets in her estate to "casually pass" through the residuary clause; thus, she intended to pass the copyrights as well as the royalties to him. On

appeal, he asks this court to affirm the exclusion of parol evidence regarding Ms. Norton's intent based on the parol evidence rule and the dead man's statute. [2]

### III. STANDARD OF REVIEW

The construction of a will is a question of law for the court; therefore, we review the trial court's conclusions of law *de novo* affording them no presumption of correctness. *In re Estate of Milam*, 181 S.W.3d 344, 353 (Tenn. Ct. App. 2005). In cases involving the construction of wills, the cardinal rule "is that the court shall seek to discover the intention of the testator, and will give effect to [that intent] unless it contravenes some rule of law or public policy." *Stickley v. Carmichael*, 850 S.W.2d 127, 132 (Tenn. 1992) (quoting *Bell v. Shannon*, 367 S.W.2d 761, 766 (Tenn. 1963)); *see also In re Crowell*, 154 S.W.3d 556, 559 (Tenn. Ct. App. 2004); *McBride v. Sumrow*, 181 S.W.3d 666, 669 (Tenn. Ct. App. 2005). Furthermore, in will construction cases, we rely on the language of the instrument to determine the testator's intent:

> [T]he testator's intention must be ascertained from "that which he has written" in the will, and not from what he "may be supposed to have intended to do," and extrinsic evidence of the condition, situation and surroundings of the testator himself may be considered only as aids in the interpretation of the language used by the testator, and "the testator's intention must ultimately be determined from the language of the instrument weighed in the light of the testator's surroundings, and no proof, however conclusive in its nature, can be admitted with a view of setting up an intention not justified by the language of the writing itself."

*In re Cromwell*, 154 S.W.3d at 559 (quoting *Nichols v. Todd*, 101 S.W.2d 486, 490 (Tenn. Ct. App. 1936)); *see also* Pritchard on Wills §§ 384, 387, 388, and 409 (2d. ed.). Our Supreme Court has said that when ascertaining the testator's intent by construing the language used in a will, we must consider the entire will as a whole. *In re Estate of Vincent*, 98 S.W.3d 146, 150 (Tenn. 2003).

### IV. ANALYSIS

---

[2]The so-called "dead man's statute" provides:

> In actions or proceedings by or against executors, administrators, or guardians, in which judgments may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, intestate, or ward, *unless called to testify thereto by the opposite party*. If a corporation is a party, this disqualification shall extend to its officers of every grade and its directors.

Tenn. Code Ann. § 24-1-203 (emphasis added). The purpose of the dead man's statute is to protect decedents' estates from fraudulent or false claims by interested parties and does not apply in cases where "the transaction about which the testimony was offered did not increase or diminish the decedent's estate but concerned only the manner in which the assets will be distributed." *Cantrell v. Estate of Cantrell*, 19 S.W.3d 842, 846 (Tenn. Ct. App. 1999) (citing *Baker v. Baker*, 142 S.W.2d 737, 744 (Tenn. Ct. App. 1940)). The statute, by its language, does not apply in this case because Dr. Horadam called Ms. Stewart to testify as an adverse witness in his case-in-chief; furthermore, her testimony related only to the manner in which Ms. Norton's estate would be distributed.

## A. Ambiguity in Will

An ambiguity is "[a]n uncertainty of meaning or intention, as in a contractual term or statutory provision." Black's Law Dictionary 88 (8th ed. 2004). Generally, parol or extrinsic evidence may not be used to vary, contradict, or add to unambiguous language used in a will, "although it is admissible to explain a latent ambiguity." *Stickley*, 850 S.W.2d at 132 (citing *Fariss v. Bry-Block Co., Inc.*, 346 S.W.2d 705 (Tenn. 1961)); *see also In re Estate of Eden*, 99 S.W.3d 82, 93 (Tenn. Ct. App. 1995). After reviewing the Will, we agree with the trial court that an ambiguity exists; however, we have determined that the ambiguity is latent, rather than patent, for which extrinsic evidence is permitted.

We first note that, to the extent the parol evidence rule is exclusionary, it does not prevent courts from hearing parol testimony that allows them to "put themselves as near as possible in the situation of the makers of the wills whose language is to be interpreted[.]" *Treanor v. Treanor*, 152 S.W.2d 1038, 1041 (Tenn. Ct. App. 1941). For example, extrinsic evidence that shows "the state of facts under which the wills were made, the situation of the properties of the testators, the members of their families and other relevant or cognate facts[,]" may be considered regardless of ambiguity classification. *Id*. (quoting *Cannon v. Ewin*, 77 S.W.2d 990, 992 (Tenn. Ct. App. 1934)). Thus, Ms. Norton's relationship to and history with the parties, as well as any inter vivos transfers of her property, are important considerations to help us understand her intent in executing the Will.

During the trial, the parties and the court seemed to urge us to clarify the distinction followed in Tennessee between a patent ambiguity and a latent ambiguity or do away with it entirely.[3] Our courts have routinely held that a latent ambiguity exists when "the equivocality of expression or obscurity of intention does not arise from the words themselves, but from the ambiguous state of extrinsic circumstances to which the words of the instrument refer[.]" *Burchfiel v. First United Methodist Church of Severville*, 933 S.W.2d 481, 482 (Tenn. Ct. App. 1996) (quoting *Weatherhead v. Sewell*, 28 Tenn. 272, 295 (1848)). Moreover, a latent ambiguity is "susceptible of explanation by the mere development of extraneous facts, without altering or adding to the written language, or requiring more to be understood thereby than will fairly comport with the ordinary or legal sense of the words and phrases made use of." *Id*.

Simply defined, a latent ambiguity is "[a]n ambiguity that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed." Black's Law Dictionary 88 (8th ed. 2004). Latent ambiguities most often arise in relation to the person and the thing identified in the document and "exist when the

---

[3]Some jurisdictions make no distinction between latent and patent ambiguities when admitting parol evidence to identify, explain, or define the subject matter imperfectly described in a writing. *See, e.g.*, *Battle v. Wolfe*, 283 S.W. 1073 (Tex. App. 1926) (noting express repudiation of the rule distinguishing patent and latent ambiguity if extrinsic evidence is necessary to identify subject matter); *Cumberledge v. Brooks*, 85 N.E. 197, 199 (Ill. 1908) (holding the admissibility of parol proof not dependent on distinction between patent and latent ambiguity); *Armistead v. Armistead*, 32 Ga. 597 (1861) (criticizing distinction as "wholly unphilosophical").

words of a written instrument are plain and intelligible, yet have capability of multiple meanings given extraneous facts." *Hargis v. Fuller*, No. M2003-02691-COA-R3-CV, 2005 WL 292346, *6 (Tenn. Ct. App. Feb. 7, 2005) (citing 96 C.J.S. *Wills* § 893 (2001)). For example, a latent ambiguity regarding the subject or thing would arise if a testator devises a parcel of his property "X" but has two parcels, "North X" and "South X." *Id*. Extrinsic evidence is then admissible to identify the property or person the testator intended to describe. *See Holmes v. Roddy*, 144 S.W.2d 788, 789 (Tenn. 1940).

Alternatively, a patent ambiguity exists when the ambiguity results from the language or wording in the instrument. A patent ambiguity is one that clearly appears on the face of a document, "[p]roduced by the uncertainty, contradictoriness, or deficiency of the language of an instrument, *so that no discovery of facts*, *or proof of declarations, can restore the doubtful . . . sense without adding ideas* which the actual words will not themselves sustain." *Hargis*, 2005 WL 292346 at *6 (quoting *Weatherhead*, 28 Tenn. at 295-96)) (emphasis added); *see also* Black's Law Dictionary 88 (8th ed. 2004). A patent ambiguity exists, for example, when two different prices for the same goods appear in a contract of sale creating a contradiction of terms on the face of the agreement. The trouble with patent ambiguities is that extrinsic "evidence cannot remove the difficulty without putting new words into the mouth of the testator, which in effect would be to make a will for him." *Hargis*, 2005 WL 292346 at *7 (quoting *Weatherhead*, 28 Tenn. at 295-96).

In the present case, the language used to describe Dr. Horadam's bequest meets the very definition of a latent ambiguity: clear and plain language on the face of the Will that becomes unclear when attempting to administer the subject matter described in the Will. At first glance, the words "the royalties from all posthumous publication of any of my works" do not appear to be ambiguous. The conflict arises only in administering the right to exploit Ms. Norton's works, i.e., the copyrights, and in distributing the monies generated by the exploitation of Ms. Norton's works, i.e., the royalties. Dr. Horadam even framed the issues in his complaint according to the definition of a latent ambiguity by requesting "a finding that the description of the bequest is clear in expressing the intent of the Testatrix, but lacks certainty and precision in defining the meaning of what types of publications (regarding both location and media format) are within the intent of the Testatrix." Accordingly, extrinsic evidence of the testatrix's intent and circumstances is necessary to understand exactly what Dr. Horadam is to receive from the bequest. We hold that a latent ambiguity exists in the Will of Andre Alice Norton and, therefore, parol evidence is admissible to determine what property Ms. Norton intended the parties to receive. The trial court is therefore reversed on its finding a patent ambiguity and its exclusion of parol testimony.

## B. Testamentary Intent and Terminology

The trial court held it was appropriate to consider evidence and testimony that would explain the meanings of the words "copyright," "royalties," and "posthumous publication" to the extent there was a standard definition or usage of those terms in the industry. The Chancellor

was also careful to explain that the extrinsic evidence would be considered only as consistent with the wording in the four corners of the Will but that testimony of the testatrix's intent was permitted solely as an offer of proof. Because we have reversed that finding, we consider all of the evidence presented, including the evidence Ms. Stewart presented in her offer of proof.

Dr. Horadam testified on his own behalf and called Sue Stewart, Jerry Scott, and Jay Bowen, an expert in intellectual property law, to testify. Ms. Stewart presented testimony from the following witnesses: Mark Anthony Karpinski, a friend of the deceased; Ollie Stewart, Ms. Stewart's husband and residuary beneficiary; Sheliah Porch, Ms. Norton's friend and caregiver; Kathy Vinson, a licensed practical nurse and Ms. Norton's caregiver; Lory Breckler, the realtor who sold Ms. Norton's house before she moved in with the Stewarts; Estelle Traylor, a long-time friend of Ms. Norton. Ms. Stewart also offered as expert witnesses William Brian Fawcett, an editor, book packager, and business agent for Ms. Norton, and Donald Reynolds, an attorney and professor of intellectual property law.

Again, when "determining the testator's intention, the true purpose of the inquiry is to ascertain not what he meant to express apart from the language used, but what the words he has used do express." 4 Bowe-Parker: Page on Wills § 32.1 (2004); *see also Stickley*, 850 S.W.2d at 132 (quoting *Martin v. Taylor*, 521 S.W.2d 581, 584 (Tenn. 1975)). We must ascertain the testator's intention "from the particular words used, from the context, and from the general scope and purpose of the will, read in light of the surrounding and attending circumstances." *Stickley*, 850 S.W.2d at 132 (quoting *Moore v. Neely*, 370 S.W.2d 537, 540 (Tenn. 1963)). Technical terms or words of art used in a will drafted by an attorney will be given their technical meaning unless the context or local usage shows a contrary intention. *Banovic v. Davis*, 642 S.W.2d 153, 156 (Tenn. Ct. App. 1982); *see also* 3 Williston on Contracts § 68 subsection 2. Where words or terms having a definite legal meaning and effect are knowingly used in a written instrument, the parties will be presumed to have intended such words or terms to have their proper legal meaning and effect, in the absence of any contrary intention appearing in the instrument. 12 Am. Jur. Contracts § 238. Copyright protection of literary works, both published and unpublished, is governed exclusively by federal statute. 17 U.S.C.A. § 301(a).[4]

It is undisputed that the Will was drafted by an attorney and that the wording in the provision benefiting Dr. Horadam and throughout the Will was chosen by Ms. Norton based in part upon her experience in the field of literature. The parties agree and the complaint confirms

---

[4]The Copyright Act of 1976 provides for the preemption of other laws, including former state copyright protection known as common-law copyright:

> On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C.A. § 301(a); *see also Salinger v. Random House, Inc.*, 811 F.2d 90, 94 (2d Cir. 1987).

that no challenge was made to Ms. Norton's testamentary capacity and there was no claim of undue influence or any ground upon which to contest the Will. From the face of the Will, it is clear that Ms. Norton used different terms to describe the rights and assets she bequeathed. In the second paragraph, subsection H she left the "copyrights" to her collaborators giving them full title and rights to those works. In the fifth paragraph, she gave "royalties" to Dr. Horadam. This use makes clear, as we construe the Will in its entirety, that Ms. Norton intended to award different rights or assets to her collaborators and to Dr. Horadam.

Indeed, Ms. Norton awarded separately the assets of "copyrights" and "royalties." The evidence shows that the copyrights and royalties from Ms. Norton's literary works were valued at approximately $250,000 according to the estate tax return filed following her death but could be worth as much as $330,000. Thus, it is important to determine what Ms. Norton meant by "royalties" and by "posthumous publication" since that determination will affect the value of the gift to Dr. Horadam and the residuary estate that passes to the Stewarts.

As the attorney who drafted Ms. Norton's Will and the only person involved in the process, Jerry Scott's testimony provides significant insight to Ms. Norton's testamentary intent. Mr. Scott met with Ms. Norton on numerous occasions in her home for the primary purpose of drafting her Last Will and Testament, "to get it just exactly the way she wanted it." He drafted several different wills, some of which were fully executed before the final Will. In each version, Mr. Scott "prepared what Ms. Norton told me to prepare."

Mr. Scott did not recall any discussion with Ms. Norton regarding the meaning of the words "royalties" or "copyrights" stating he had no reason to discuss those terms with her: Ms. Norton "knew what copyright was" and probably knew more about their meaning than he did having received both copyrights and royalties and in dealing with publishers, agents, and book companies over her long career. Mr. Scott testified as follows regarding Ms. Norton's intent behind the bequests:

> Q: In referring again to the fifth paragraph to Dr. Horadam, no copyrights were given to him, correct?
>
> A: She calls it the royalties. That was the word she used. That was the word I used.
>
> Q: All right.
>
> A: *I don't think we made any distinction between, you know. She didn't name him to be the copyright owner. She said he was to receive the royalties.* These people [the collaborators] had helped write the books, and that's the reason she specifically wanted them to own the copyright so that in the future anything that happened on those particular books, you know, instead of being co-owners of copyrights, now they have the simple interest in copyrights, the writers with whom she worked.

Q:      And from the drafting of the Will, referring to paragraph 6, where it says, all the rest and residue of my property I give to Sue Stewart and husband Ollie, that would include all remaining copyrights not listed in the Will?

A:      Well, that's a question, I guess, the court is going to have to decide. I know what you are driving at is that if she owns the copyright, she gets the royalties from those particular books, but she said she wanted the royalties of all posthumous publications of any of my works. *And I think she knew what she meant. She knew what posthumous meant. She knew what royalties meant. She knew what various terms were.*

(Emphasis added). In construing the Will, Mr. Scott believed "the ownership and copyrights would pass under the Will to Ms. Stewart and her husband. At the same time, I think that the royalties from any posthumous publication of books would go to Dr. Horadam."

Dr. Horadam's expert witness, Jay Bowen, is a licensed attorney licensed in the State of Tennessee with over 30 years of experience in the area of copyright law and intellectual property rights. Mr. Bowen recognized *Nimmer on Copyright* as the leading treatise in the area of copyright law and offered expert testimony as to the meaning of the terms at issue:

Q:      Will you describe to the court . . . the difference between a copyright and a royalty? If you can give us a layman's description of those two concepts, please.

A:      Certainly. A copyright is provided by the U.S. Statutes, Title XVII of the U.S. Code. A copyright is really a legal term. And it means one of the several rights that are defined and mentioned in 17 U.S.C. § 106 of the Copyright Law. A copyright is a bundle of rights. A royalty, in contrast – and a copyright is a federally created statutory constitutional right. A royalty, on the other hand, is merely – I say merely – it's an important right. But in contrast, a royalty is the right to receive income with respect or [pay] from the exploitation of the contract.

. . . .

Q:      Have you analyzed [the Fifth item of Ms. Norton's Will] in the context of determining, first of all, whether there is any ambiguity to that phrase and, secondly, what your conclusions are regarding the meaning of posthumous publication of any of her works?

A:      Yes. From a copyright lawyer's, intellectual property, copyright lawyer's perspective, to me, that phrase is clear. And "publication" is a term of art that is defined in 17 U.S.C. § 101. And "publication" is defined – I can look at the statute. But paraphrasing, *publication* under the copyright law is defined as *any distribution of a work to the public.*

So, that term "publication" has a very specific meaning under the copyright law.  To me, that phrase is clear, and it means any distribution posthumously of any works of the author.  The royalties arising from any posthumous publication or broad general distribution would belong to Dr. Horadam.

. . . .

Q:      So, you would characterize to the Court the word "publication" as a word of art that means any dissemination at any time?

A:      Absolutely, by definition in section 101 of the copyright law.

Q:      And I won't ask you to define 'posthumous' unless you feel inclined to do so.

A:      I'll try if you ask me.

Q:      Seriously, within your field of expertise, that's a common Webster's dictionary word that has no –

A:      After the death.

(Emphasis added).

Mr. Bowen explained that the ownership of the copyright without the royalties is still a very valuable property in and of itself.  Mr. Bowen explained that it is common in the industry for a copyright owner, who does not have the resources to fully exploit or promote his work, to sell his copyright to a publisher whose job is to exploit that copyright in return for a percentage of the royalties. Royalties, he said, are the monies generated by the exploitation of the copyrighted work which "does not include such things as an executive producer fee, a consulting fee, anything that Ms. Stewart could and would negotiate, arising from the sale or transfer of the copyright…."  Royalty income is but one of many income streams that can be generated from the exploitation of a copyright.  Mr. Bowen concluded "that under the residuary, the ownership of the copyright of the works, other than those that were specifically devised to the co-authors early in the Will, went to Mrs. Stewart."  In his opinion, "the royalties with respect to what happens when those copyrights are exploited or sold, . . . with respect to . . . any of the testatrix's works after her death, any of those arising from the sale of the books, goes to Dr. Horadam."

However, the trial court did not reach the same conclusion as Mr. Bowen.  The court was concerned instead about affecting the copyrights given to Ms. Norton's collaborators and protecting their right to the royalties from those works.  Dr. Horadam's position that "all *posthumous publication* of any of my works" meant any distribution of a work by Andre Norton, included reprints of her previously published works.  Although Dr. Horadam stated he was not seeking, and would not accept even if granted to him, the royalties generated from the copyrighted works co-authored by Ms. Norton with another author (those copyrights bequeathed in subsection H), his interpretation of the phrase would entitle him to those royalties.  We believe the trial court attempted to avoid this result by awarding both the copyrights and royalties to Dr. Horadam.  Yet if we apply the construction used by the trial court, that copyrights and royalties meant the same thing to Ms. Norton, there is nothing in the Will to prevent Dr. Horadam from later arguing he is entitled to the royalties generated from the

-12-

distribution of these coauthored works because they could still be considered part of Ms. Norton's works. This is not the result we believe Ms. Norton intended.

It is well-settled that a will conveys only what the decedent owned at the time of death because a will speaks at the death of the testator, not from its execution date, unless a contrary intention appears in the will. *See, e.g., Milam*, 181 S.W.3d at 353-54; *Stickley*, 850 S.W.2d at 131. Thus, any copyright that was sold or transferred prior to Ms. Norton's death, such as the rights to <u>Taste</u>, would not be subject to the Will because it would no longer be hers to transfer. We apply the same rationale to the order of the bequests in Ms. Norton's Will. Ms. Norton expressly bequeathed the copyrights to works she co-authored with collaborators without reserving any rights therein. Because she did not expressly reserve the right to receive royalties, the right to receive royalties was assigned to her collaborators with the copyrights. "An express and unequivocal disposition of property in one clause of a will cannot be controlled by any inference from the context of any probable oversight or mistake of the testator in that disposition." J. Robinson, J. Mobley & A. Hedrick, 1 Pritchard on Wills & Administration of Estates § 410 (6th ed. 2007).

Having previously disposed of the full copyrights to her co-authors and without expressly reserving any rights incident to those copyrights, *see, e.g.*, *Cohen v. Paramount Pictures Corp.*, 845 F.2d 851, 854 (9th Cir. 1988), we, therefore, cannot infer that Ms. Norton intended to give the royalties generated from those collaborative works to Dr. Horadam. Based on the evidence in the record and the Will as a whole, we find Ms. Norton clearly intended to award two different assets when she referred to "copyrights" and "royalties" in her Will. Therefore, we reverse the trial court's determination that Ms. Norton used the terms "copyrights" and "royalties" interchangeably. In order to properly interpret the meaning of Ms. Norton's bequests, we must examine what, if any, technical meaning is assigned to the terms "copyright," "royalty," and "posthumous publication."

The Copyright Act of 1976, 17 U.S.C.A. § 101, *et seq.*, was an ambitious undertaking by Congress resulting in a comprehensive revision of the copyright laws. The Act provides that a copyright owner has the exclusive right to do or authorize any of the following:

> (1) to reproduce the copyrighted work in copies or phonorecords;
>
> (2) to prepare derivative works based upon the copyrighted work;
>
> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
>
> (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictoral, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C.A. § 106. The copyright owner holds exclusively the right to reproduce the copyrighted work. Am. Jur. Copyright § 70 (citing 17 U.S.C.A. § 106(1)). In practice, the author typically contracts to sell his or her rights in a work to publishers in exchange for a percentage of the royalties generated by the publisher's services in the exploitation of the author's work. *Id.* (citing *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 547 (1985)).

Royalties "are created by contracts of assignments of copyrights, and hence are controlled by contract law…." *Hayes v. Carlin America, Inc.*, 168 F. Supp. 2d 154, 157 (S.D.N.Y. 2001). The right to receive royalties is not among the exclusive rights afforded the copyright owner in the Copyright Act. *Id.* at 158. Thus, no express definition of the term "royalty" appears in the Act. As defined by common law, "a royalty is simply an interest in receiving money when the owner of the copyright exploits it." *Id.* (quoting *Yount v. Acuff Rose-Opryland*, 103 F.3d 830, 834 (9th Cir. 1996)). Based on the care with which Congress defined the rights accompanying copyright ownership separate and apart from any royalty right, we cannot agree that "a copyright is essentially valueless" as Dr. Horadam suggests. Unlike real property or other forms of personal property, a copyright is "by its very nature incapable of accurate monetary evaluation prior to its exploitation." *Bartok v. Boosey & Hawkes, Inc.*, 523 F.2d 941, 944-45 (2d Cir. 1975) (citing 2 Nimmer on Copyright § 113).

At trial, the court heard additional opinion testimony from William B. Fawcett and Arnold P. Reynolds, witnesses presented by Ms. Stewart as experts to testify to the meaning of "posthumous publication." Mr. Reynolds is a licensed attorney in Illinois and New York specializing in patent and trademark law. Mr. Reynolds was asked to construe the fifth paragraph of Ms. Norton's Will. He noted that "posthumous publication" is not a term of art because those words are not defined or used together in copyright law and to his knowledge have not been interpreted together in any jurisdiction. Our jurisdictional review yielded the same conclusion. In Mr. Reynolds' opinion, posthumous publication means "something that was published after the death of the decedent."[5]

---

[5] Dr. Horadam objected to Mr. Reynolds being qualified to testify as an expert witness because he is not a "copyright attorney." Tenn. R. Evid. 702 governs testimony by experts: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understanding the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Decisions regarding the admissibility of expert testimony, particularly the expert's qualifications and competency, is within the sound discretion of the trial court. *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993); *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439 (Tenn. 1992). We find it unnecessary to limit the fields of expertise in this case as all the expert testimony offered assisted the trier of fact as evidenced in the court's memorandum opinion.

William Brian Fawcett is a science fiction fantasy writer, book packager, publisher, and editor. Mr. Fawcett has over thirty years' experience in the industry and a number of fantasy works he authored have been published. More importantly, he worked with Andre Norton directly. Before her death, Ms. Norton contacted Mr. Fawcett asking him to assist her estate with the book business once she passed. Specifically, Ms. Norton said to him that "Sue's going to need you to handle the books." As Ms. Norton's intent controls in construing her will, we accept Mr. Fawcett's testimony more for his ability to shed light on what she meant and less for his expert qualifications. As such, Mr. Fawcett testified that, "a posthumous publication in publishing is a book that wasn't in the pipeline or didn't exist before the person died." He explained that a posthumous publication does not mean a reprint of material; rather, it includes material discovered or presented after death which no one had previously published.

The parties and experts agree the word "posthumous" is not defined by copyright law but may be based upon ordinary, common usage which needs no expert interpretation. The accepted dictionary definition for "posthumous" was cited by *Nimmer* in the context of copyright renewal rights as "[p]ublished after the death of its author, as posthumous poems." 3 Nimmer on Copyright § 9.03.[6] The meaning and interpretation of the word "publication" taken together with "posthumous" however, is the source of the dispute. Dr. Horadam contends the word "publication" is a term of art defined by statute and construed by treatise that means any dissemination of a literary work, whether for the first time or subsequently, as in a reprint of an earlier work. Ms. Stewart argues "posthumous publication" refers to any work by Andre Norton that is published or distributed for the first time after her death. For example, works capable of "posthumous publication" would include any publication of Ms. Norton's personal diaries or letters or a novel developed from her unfinished manuscripts.

Relying on *Nimmer* and the Copyright Act of 1976, Mr. Bowen opined that there is no distinction between a first publication and any subsequent publication of protected works stating, "[a] publication is a publication" but later stated there is a difference between an "original

---

[6]The Second Circuit cautioned against construing highly technical terms by standard dictionary definitions:

> Neither Webster's nor any other dictionary definition refers to the Copyright Act concept of "publication," a definition sufficiently technical that the leading copyright treatise takes an entire chapter to explain it. Semantically, moreover, the word "posthumous" does not even carry with it a connotation of publication, being limited to describe the lastborn of a family and so to one born after his father's death.

*Bartok*, 523 F.2d at 945 n.6 (citing H. Fowler, A Dictionary of Modern English Usage 468 (2d ed., revised 1965) (citations omitted)).

publication" and a "first publication."[7]  He characterized the word "publication" as a term of art meaning any dissemination at any time as defined in Section 101 of the copyright law:

> "Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending.  The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication.  A public performance or display of a work does not of itself constitute publication.

17 U.S.C.A. § 101.  The above definition of publication applies to works governed by the 1976 Act which took effect January 1, 1978 but generally constitutes a codification of the definition construed under the 1909 Act.  5 Nimmer on Copyright § 21.03; 1 Nimmer on Copyright § 4.04.  The relevant decisions construing "publication" before the effective date of the 1976 Act indicate that "publication occurs when by consent of the copyright owner the original or tangible copies[8] of a work are sold, leased, loaned, given away, or otherwise made available to the general public…."  1 Nimmer on Copyright § 4.04 (2000) (citations omitted).

The court relied heavily on Mr. Bowen's opinion that in this case, "the technical meaning of the word 'publication' includes *any* dissemination of a literary work (first or subsequent) after the death of Andre Norton."  (Emphasis added).  However, *Nimmer* recognizes a "fundamental problem, with ramifications for both judge-made rules and legislation, is that words are often used in the copyright context with special meaning, at variance from their more typical usages, and may even be used in disparate contexts in the copyright realm itself with different meanings."  1 Nimmer on Copyright OV-9.  Judge Frank of the Second Circuit Court of Appeals aptly addressed this same difficulty when asked to determine whether publication of a copyrighted work occurred when distributed initially to potential publishers for the purpose of securing later publication:

> In deciding whether certain acts constitute 'publication,' . . . we are confronted with numerous conflicting cases which, by their holdings, though not in their stated rationale, raise more than a suspicion that the term 'publication' is clouded by semantic confusion where the term is defined for different purposes, and that we have here an illustration of the one-word-one-meaning-only fallacy.

---

[7]Mr. Bowen explained: "A publication is a publication.  There is a difference in an original publication or a first publication and a publication, as the words state.  A first publication is a first publication.  And *Nimmer*, as a matter of fact makes a distinction between a first publication and publication."  Under the Copyright Act of 1909, the term of copyright protection for unpublished works was measured "from the date of first publication" and is relevant to the issue of renewal rights not present in this case.  *See* 1-1 Nimmer on Copyright § 1.05.

[8] The word "copies" is defined as "material objects, other than phonorecords, in which a work is fixed … and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term 'copies' includes the material object, other than a phonorecord, in which the work is first fixed."  17 U.S.C.A. § 101.

*American Visuals Corp. v. Holland*, 239 F.2d 740, 742 (2d Cir. 1956).  The same court again noted that the word "publish" is a term that "has a variety of definitions in the Copyright Act depending upon the context."  *Bartok*, 523 F.2d at 945.

In *Bartok*, the Second Circuit construed "posthumous works" to include those having received no public dissemination in any form during the author's life.  *Bartok*, 523 F.2d at 945-46.  At issue in *Bartok* were the renewal rights to the copyright of the decedent's musical composition, which he had completed, performed, and executed a contract for the assignment of its copyright before his death but tangible copies of the concerto were not distributed to the general public until six months after his death.  *Id*. at 943.  The House Report on the Copyright Act of 1976 endorsed *Bartok v. Boosey & Hawkes, Inc.*, 523 F.2d 941 (2d Cir. 1975), and "understood that case to define the term 'posthumous work' as 'one as to which no copyright assignment or other contract for exploitation of the work has occurred during an author's lifetime, rather than one which is simply first published after the author's death.'"  *Legislator 1357 Ltd. v. Metro-Goldwyn-Mayer, Inc.*, 452 F. Supp. 2d 382, 389 (S.D.N.Y. 2006) (quoting *House Report No. 94-1476*); *see also* 3 Nimmer on Copyright § 9.03(a).  We are therefore persuaded by the comprehensive examination of the terms "posthumous" and "publication" and find the *Bartok* definition exceedingly instructive in our analysis.

Having determined there is no statutory or common definition of the term "posthumous publication" in the area of copyright law or publishing, we look to evidence of what Ms. Norton intended by "posthumous publication."  Of particular significance is her use of the word "posthumous."  We find no reason why Ms. Norton would have chosen to use a word meaning "after death" in a document she knew would take effect only after her death unless she intended it to modify the type of publication she referenced in the fifth paragraph.  In that sense, "posthumous publication" is distinguished from another type of publication.  Had Ms. Norton intended Dr. Horadam to receive the royalties from any publication or dissemination of her works, she could easily have left both words out altogether, devising "the royalties from all of my works" or "all of my royalties."  Instead, she qualified what royalties he was to receive by limiting them to the royalties generated from a specific type of publication.  She did not qualify the type of works that may be published posthumously, referring to "*any* of my works."  "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"  *U.S. v. Gonzales*, 520 U.S. 1, 5, 117 S. Ct. 1032, 1035, 137 L.Ed.2d 132 (1997) (quoting Webster's Third New International Dictionary 97 (1976)).  It appears to us that by using the term "any" before "works," Ms. Norton intended to authorize the posthumous publication of her works in the broadest sense of the word, including those works for which she is not typically known, such as her letters or diaries.  Dr. Horadam testified that he knew part of the material he purchased through Klon Newell were unpublished works and materials including unfinished short stories.  It is undisputed that a number of Ms. Norton's works in the possession of Dr. Horadam are yet unpublished and are capable of "posthumous publication" according to the definition advanced by Ms. Stewart.

Furthermore, we do not believe Ms. Norton intended "posthumous publication" to include the reprints of her previously published works. In support of this conclusion, we rely on evidence of her prior use of the term. In Ms. Norton's "Transfer of Rights" in the novel Taste, she detailed the nature of the literary rights included in the assignment and stated in part that Ms. Stewart held "the common law property rights therein, and the right to secure copyright and all renewals and extensions of copyright … and to hold such copyright and all rights of whatsoever nature there under in perpetuity." The document further stated, without limiting the scope of the assignment, that it included: "All rights and interest in the Work including, but not limited to the full sole and exclusive right to *publish, print, reprint,* copy, sell, vend, and market the literary work and any subsequent or revised editions thereof…." Here, Ms. Norton makes a distinction between publishing, printing, and reprinting.

Ms. Stewart presented a significant amount of evidence of Ms. Norton's expressed intent for the distribution of her estate. A video tape of Ms. Norton was introduced in which she talked about her family, illnesses, and wishes after death. The videotape was recorded by Mr. Mark Karpinski on July 25, 2004 several months before her final Will was executed. In the video, Ms. Norton declared "that all of the assets that are mentioned in my Will are to go just where I said." Again, she expressly stated that whatever small amount she left, she wanted it "to go exactly to whom [sic] I say it is in the Will. And my greatest desire for the heirs, that the best will remain for Sue Stewart and her husband, who so kindly offered to take me into their home and enlarge it so that I would be a member of the family, and to others who took care of me when I was ill and who did things for me." We recognize that the video tape provides a rare opportunity to hear directly from the testatrix her intent but must note that the video was created five months before the final Will was executed. Ms. Norton had the right to change her mind about the dispositions in her Will at any point between July and December 2004.

It appears Ms. Norton expressed the same sentiment to a number of her close associates before her death. Jean Rabe, a science fiction writer who helped finish Ms. Norton's final manuscript for A Taste of Magic, knew Ms. Norton from 1999 until her death in 2005. Ms. Rabe testified that in October of 2004, Ms. Norton told her that "Sue was going to get everything" and that she never heard Ms. Norton mention Dr. Horadam. Ms. Norton's realtor, Lory Breckler, testified that Ms. Norton stated on at least two separate occasions in 2004 that she intended "to take care of" Ms. Stewart and "reward Sue for all of the good deeds that she had done." When Ms. Breckler asked what Ms. Norton meant by "take care of," she replied, "I'm going to leave the bulk of my estate to Sue. And I want her to take care of my rights on my books and things of that nature." Kathy Vinson, the nurse who cared for Ms. Norton several days a week beginning in October 2004, testified that Ms. Norton stated she wanted Ms. Stewart to have her works. This testimony supports our conclusion that Ms. Norton intended that her remaining copyrights pass to Ms. Stuart and reveals more about her circumstances at the time the Will was executed.

Lastly, we disagree with the trial court's stated rationale for awarding the copyrights and royalties to Dr. Horadam. The trial court found that Ms. Norton considered the level of the parties' appreciation for her work in dividing her estate, explaining:

-18-

The Court agrees with the contention of [Dr. Horadam] that Ms. Norton was aware that Dr. Horadam had more of an appreciation for the literary works of Ms. Norton than did Sue Stewart as evidenced by the fact that he began reading her books as a child and wrote correspondence to her about them for twenty-four to twenty five years. The Court also takes notice that Ms. Norton omitted her family members from the will in part because they did not appreciate her science fiction books. This would support the finding that Ms. Norton intended for Dr. Horadam to benefit from her literary works because of his longtime devotion to her work. She had already made substantial provisions for Sue Stewart.

While we do not disagree that Dr. Horadam greatly appreciated Ms. Norton's craft for many years, we do not believe Ms. Norton weighed the parties' levels of appreciation in awarding her works. The fact that Ms. Norton omitted any family members lends little support for this conclusion. Ms. Norton acknowledged that she had no real relationship with her family for many years because they disapproved of the subject matter of her novels for religious reasons.

The evidence showed Ms. Norton entrusted Ms. Stewart with her literary works long before and in contemplation of her death. Ms. Stewart held a Durable Power of Attorney with broad authority over these works. In the January 2004 version of her will, Rose Wolf was appointed executrix of all aspects relating to Ms. Norton's literary work and Sue Stewart was appointed executrix of her estate "in all other aspects including the gathering of all my nonliterary property, be it real, personal or mixed, the payment of all of my just debts, and the distribution of all property in accordance with this my last Will and Testament, excepting specifically all literary property, including books, royalties, contracts, copyrights, and so forth." Following Ms. Wolf's departure, that provision was changed to name Ms. Stewart as executrix over all aspects of Ms. Norton's estate. Ms. Stewart corresponded with Ms. Norton's book publisher, coauthors, and many of Ms. Norton's contacts in the publishing world. She was not as much a novice in this arena as suggested at trial. We find the above is further evidence that Ms. Norton intended to leave the copyrights to Ms. Stewart for exploitation in the literary world of science fiction.

After thorough consideration of all the evidence appearing in the record, we conclude Andre Alice Norton intended to leave her collaborators and co-authors the copyrights to the works specified in the Will, which include the right to any and all royalties generated from the exploitation and publication of these works, posthumous or otherwise. Dr. Horadam has no interest in the copyrights bequeathed to the collaborators in paragraph second, subsection H of her Will. It was Ms. Norton's intent that Dr. Horadam inherit her blue notebook containing the listing of all her books and that he inherit all of the trophies and plaques she received during her writing career. It was also Ms. Norton's intent that Dr. Horadam inherit royalties from the exploitation of some of her works; however, she did not bequeath unto Dr. Horadam any copyrights to her works. Instead, all copyrights to her works were either assigned inter vivos without reservation of the right to receive royalties (which works are not subject to the Will because she did not own them at the time of her death), or the copyrights were specifically bequeathed to others in her Will, or they were bequeathed to Sue Stewart and her husband, Ollie

Stewart, pursuant to the residuary clause of the Will. Ms. Norton did, however, bequeath unto Dr. Horadam the right to receive royalties that are derived from the exploitation of some the works bequeathed to the Stewarts in the Will, specifically works for which there had been no contract to exploit the works during Ms. Norton's lifetime. Any and all rights, including royalties, not otherwise disposed of in the Will pass to the Stewarts pursuant to the residuary clause.

## V. ADMINISTRATOR AD LITEM

Due to the circumstances and litigation surrounding the administration of Ms. Norton's estate, the trial court appointed a substitute executrix, or administrator ad litem, at Dr. Horadam's request to determine which assets were to be awarded him based on the court's interpretation of the Will. Tenn. Code Ann. § 30-1-109(a) imposes a duty upon the chancery court to appoint an administrator ad litem of a decedent's estate if "the executor or administrator of the estate is interested adversely to the estate" and Tenn. Code Ann. § 30-1-109(b) requires the court to make such an appointment "whenever the facts rendering it necessary appear in the record of such a case. . . ." Although we have reversed the court's interpretation of the Will, we agree that it is reasonable to have an independent party serve in this capacity. *See* Tenn. Code Ann. § 30-1-109. The executrix is charged with the task of gathering all Ms. Norton's literary property and the distribution of assets under the Will. We have determined that it is in the best interest of the parties and the estate to have a disinterested third party oversee these distributions. Therefore, we affirm that portion of the court's order appointing an administrator ad litem to facilitate the administration of the estate of Andre Alice Norton.

## VI. CONCLUSION

Upon review of the Last Will and Testament of Andre Alice Norton, we hold that a latent ambiguity existed in the bequest to Dr. Horadam of "the royalties from all posthumous publication of any of my works." Having carefully reviewed the record, the applicable law, and the entirety of the evidence presented, including evidence of Ms. Norton's intent in Ms. Stewart's offer of proof, we conclude that the trial court erred in its interpretation of the Will, but we affirm the decision to appoint an administrator ad litem. The judgment of the trial court is therefore reversed in part, affirmed in part, and remanded for further proceedings consistent with this opinion. Costs of appeal are taxed equally against Appellant Sue Stewart, Executrix of The Estate of Andre Alice Norton, and against Appellee Dr. Victor Horadam.

_____
JEFFREY F. STEWART, SPECIAL JUDGE