IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 31, 2010 Session

## RAY BELL CONSTRUCTION CO., INC. v. STATE OF TENNESSEE, TENNESSEE DEPARTMENT OF TRANSPORTATION

**Appeal from the Claims Commission**
**No. T20071215-1       William O. Shults, Commissioner[1]**

---

**No. E2009-01803-COA-R3-CV - Filed November 24, 2010**

---

This case concerns an alleged breach of contract involving the incentive clause of a Tennessee Department of Transportation ("TDOT") road construction contract. Before the Claims Commission, TDOT argued that the contract language was clear in prohibiting an extension, alteration, or amendment of the incentive clause. The Claims Commission agreed with the position of Ray Bell Construction Company ("RBCC") that it was entitled to a modification of the incentive provision. To so find, the Commission held that "a definite latent ambiguity exists for which parol evidence not only is admissible, but frankly, absolutely necessary in both understanding and deciding the issues in this case." TDOT has appealed. We affirm the decision of the Claims Commission.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Claims Commission Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., joined, and D. MICHAEL SWINEY, J., filed separate dissenting opinion.

Robert Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; and Melissa Moreau, Assistant Attorney General, Nashville, Tennessee, for the appellant, State of Tennessee.

Gregory L. Cashion, Matthew J. DeVries, and Craig N. Mangum, Nashville, Tennessee, for the appellee, Ray Bell Construction Company, Inc.

---

[1]Sitting by interchange for Commissioner Nancy Miller-Herron, Commissioner for the Western Grand Division.

**OPINION**

## I. BACKGROUND

The project at issue was located at the I-40/I-240 Midtown Interchange beginning at Ayers Street and extending to Vollintine Avenue in Memphis, Shelby County, Tennessee (the "Midtown Interchange Project").[2] RBCC's scope of work included grading, drainage and paving work, as well as the construction of seven bridges, 22 retaining walls and 12 noise barriers. Funding for the $52.8 million contract was split between TDOT at 10 percent participation and the Federal Highway Administration ("FHWA") at 90 percent participation.

When TDOT refused to agree that RBCC was entitled to recover an incentive payment upon completion of its work, RBCC filed a claim in the Claims Commission on May 4, 2007. The trial was conducted in this matter October 27-30, 2008.

### PROVISIONS REGARDING CONTRACT TIME

The contract between RBCC and TDOT contained two distinct sections that address time extensions – the Standard Specifications and the Special Provisions. Standard Specification 108.06 allowed RBCC to receive a time extension where the work quantities have been increased and the work has been delayed due to reasons beyond RBCC's control:

> The number of days for performance allowed in the Contract as awarded is based on the original quantities as defined in Subsection 102.03. ***If satisfactory fulfillment of the Contract requires performance of work in greater quantities than those set forth in the proposal, the contract time allowed for performance shall be increased on the basis commensurate with the amount and difficulty of the added work.*** If the Engineer determines that an increase in the contract working time proportionate to the value of the increase in quantities is commensurate with the amount and difficulty of the added work and a written request to extend the time as provided below has not

_____

[2]As noted by the Commission, "[t]he planning stages for this project began in the late 1960's and at one point involved a case which resulted in an important United States Supreme Court decision." *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed. 136 (1971). When the interchange at issue was originally designed, the plans had it extending through the center of Memphis and through Overton Park. The revisions to the plans resulted in an interchange with I-40 traffic making an awkward turn onto a one-lane, 25-mile-per-hour ramp. The project at issue was designed to correct the perceived deficiencies.

been made, he may proportionately increase the contract working time.

If the Contractor finds it impossible for reasons beyond his control to complete the Work within the contract time as specified or as extended in accordance with the provisions of this Subsection, he may, at any time prior to the expiration of the contract time specified or as extended, make a written request to the Engineer for an extension of time setting forth therein the reasons which he believes will justify the granting of his request. The Contractor's plea that insufficient time was specified is not a valid reason for extension of time. If the Engineer finds that the Work was delayed because of conditions beyond the control and without the fault of the Contractor, he may extend the time for completion by a properly executed Supplemental Agreement in such amount as the conditions justify. The extended time for completion shall then be in full force and effect the same as though it were the original time for completion.

(Emphasis added). Fred Clayton, formerly employed by TDOT for 17 years and RBCC's Project Manager[3] on the Midtown Interchange Project, testified at trial that the first paragraph above invokes the use of the "pro-rata method" for determining a time extension when there are quantity overruns – i.e., a time extension will be granted on a pro-rata basis for the increased quantities of work above and beyond the original bid. According to Mr. Clayton, the second paragraph deals with those delays beyond a contractor's control, such as a change in design or TDOT's inability to secure an easement to property.

Special Provision 108(B) ("SP108B") addressed liquidated damages, incentive payments and disincentive payments as follows:

The project shall be completed in its entirety on or before December 15, 2006.

For each calendar day prior to December 15, 2006, that all work in the original contract has been completed and all lanes are opened to the free, safe and unrestricted passage of traffic, an incentive payment of ten thousand dollars ($10,000) per day shall be made to the contractor as an incentive. However, the maximum amount of incentive payments shall not exceed two million five hundred thousand dollars ($2,500,000).

For each day after December 15, 2006, that all work in the original contract is

---

[3] As Project Manager, Mr. Clayton was generally involved in the day-to-day operations of the project. He was also the primary point of contact for TDOT and its engineer of record, Allen & Hoshall.

not completed, the sum of ten thousand dollars ($10,000) per day shall be deducted from monies due the Contractor as a disincentive. The amount of monies that may be deducted as a disincentive shall be unlimited except that the disincentive may be waived if the working time is extended in accordance with the Standard Specifications.

. . . The December 15, 2006, completion date may be extended in accordance with the Standard Specifications, however, no incentive payment will be made if work is not completed in its entirety by December 15, 2006.

Pursuant to Paragraph 4 of the contract, TDOT agreed to pay RBCC in accordance with "the 1995 Standard Specifications, Supplemental Specifications and applicable Special Provisions." The contract contained a precedence clause providing that the Supplemental Specifications control over the Standard Specifications, the contract plans govern over both the Supplemental and Standard Specifications, and the Special Provisions control over the contract plans and the Supplemental and Standard Specifications.

The contract between RBCC and TDOT was signed by both parties in May 2003. The work commenced on June 18, 2003, and was to be completed on or before December 15, 2006. The projected duration of the Midtown Interchange Project was originally scheduled to be 1,277 days.

The record reveals that RBCC's work suffered several setbacks. According to Mr. Clayton, RBCC experienced a number of delays beyond its control. The primary delays included: (a) redesign of certain abutments due to concerns that the pile driving activities were damaging an adjacent historical church property (the "Redesign delays"); and (b) a delayed right-of-way on Tract 163 of the project where TDOT was unable to timely secure the easement (the "Easement delays"). Although other delays existed, the Redesign and Easement delays were the only ones for which RBCC sought additional time. Specifically, RBCC sought 180 days in contract time for the Easement delays and 154 days for the Redesign delays. In response, TDOT issued Supplemental Agreement/Request for Construction Change Number 24, Category 1 ("SA-24"), which authorized an extension of time of 137 calendar days (30 days for the Easement delay and 107 days for the Redesign delay). Accordingly, SA-24 extended the completion date from December 15, 2006, to May 1, 2007. However, the proposed SA-24 expressly stated that the time extension would not apply to the incentive payment. RBCC made numerous requests that TDOT apply the contract extension of 137 days to the incentive date, but TDOT refused to do so. Consequently, RBCC did not execute the SA-24.

-4-

## TWENTY PERCENT MORE WORK

It is RBCC's position that because it was required to complete 20 percent more work based on unanticipated overruns in the total quantities of components used to complete the work, additional days should be tacked onto the originally anticipated completion date as authorized by Standard Specification 108.06 for incentive earning purposes.[4] According to RBCC, the Standard Specifications recognized that the number of days for performance of the work is based upon the "original quantities" in the bid. Per Standard Specification 108.06, "[i]f satisfactory fulfillment of the Contract requires performance of work in greater quantities than those set forth in the proposal, the contract time allowed for performance shall be increased on a basis commensurate with the amount and difficulty of the added work." RBCC contends that Standard Specification 108.06 made extension of the completion date mandatory if "greater quantities than those set forth in the proposal" and the time requested are "commensurate with the amount and difficulty of the added work." RBCC argues that the pro-rata method applied to its contract with TDOT, meaning that if 20 percent more quantity was added to a project, it is entitled to 20 percent more time to complete such a project.

David Donoho, Director of Construction for TDOT, testified that pro-rata adjustments under Standard Specification 108.06 had been used in the past and allowed TDOT to make adjustments "based on over-runs and contract quantities." According to Mr. Donoho, computing pro-rata adjustments was a simple process and saved time and expense.

Based upon the original quantities in the original bid documents, RBCC earned the original contract revenue of $52,882,351.76 as of March 15, 2006. According to Monthly Construction Reports prepared by TDOT, 97.67% of the work was complete as of February 15, 2006, and 102.15% of the work was complete as of March 15, 2006. The Commission recognized that judging simply the original contract work, RBCC would have completed the contract by March 2006. Based on the estimated quantities prepared by TDOT's own engineers, RBCC experienced quantity overruns of 20 percent of the total contract price. According to RBCC, the estimated contract quantities overran or exceeded the actual quantities by approximately $10.8 million dollars.

---

[4]According to Mr. Clayton, the installed quantities are tracked by TDOT's engineer based upon progress payments. An "overrun" occurred when RBCC installed more of a particular quantity of material than was projected on TDOT's estimated quantities provided at the time of bidding. A contractor like RBCC bids a quantity estimated or established by TDOT with a unit price for each item of work. On the Midtown Interchange Project, there were more than 565 items of work. The contract sum was established by multiplying the estimated quantities by the unit prices. TDOT pays the contractor for the actual quantities multiplied by its unit pricing, as evidenced on its Engineer's Estimate Reports.

TDOT argues that the construction problems did not slow down completion of the project in its entirety since RBCC was freed up to utilize its resources on other aspects of the work while the problems were being resolved. Brian Egan, TDOT's Region 4 Assistant Director of Construction at the time of this contract, opined that RBCC was not delayed on overall completion of the project. However, Stan Klenk, Chief Engineer for Allen & Hoshall[5] ("A & H"), TDOT's Engineer of record, acknowledged that simply because a contractor was able to work on one part of an improvement which was not critical did not necessarily mean it was advancing the work, and that potentially if the contractor identified work in a critical area it could not perform at a scheduled time, then this could delay the project as a whole. Furthermore, as Mr. Clayton testified, under this contract there was no requirement that the work be evaluated pursuant to the Critical Path Method ("CPM").[6]

## COMPLETION DATE

RBCC's witnesses and TDOT's representatives testified that all lanes and ramps were open to traffic on December 12, 2006. In accordance with the Standard Specifications, by letter dated December 12, 2006, RBCC notified TDOT that the Midtown Interchange Project was presumptively complete. Eric Criswell, a TDOT engineer representative who worked for A& H, alerted TDOT officials by email that all lanes and ramps were open to traffic as of December 12, 2006. In his testimony, Mr. Egan confirmed that all lanes were open to traffic as of December 12, 2006. On December 20, 2006, Mr. Klenk wrote Mr. Clayton that contract time charges were stopped effective December 17, 2006, since at that time, "the project was determined to be substantially complete" and all lanes were open to traffic and the work remaining to complete on the project was relatively insignificant.[7] Without an extension of the incentive deadline, the finding by TDOT that the Midtown Interchange Project was completed after December 15, 2006, precluded RBCC from receiving any bonus.

---

[5]A & H was a private consulting firm hired by TDOT to design and oversee the construction of the Midtown Interchange Project.

[6]On projects begun after February 2005, some TDOT contracts demand a CPM analysis requiring the detailed diagramming of project tasks that must be completed in order to finish a job on schedule. In current contracts, Mr. Donoho noted that CPM is required if there is an incentive clause. If there is a CPM requirement in a current contract, there will be no extensions of the completion dates utilizing the pro-rata method set out in Standard Specification 108.06.

[7]It appears that the work "in its entirety" was not completed until November 8, 2007.

## DONOHO MEETING

After TDOT first denied RBCC's claim for additional time and compensation, Bruce Nicely, Senior Vice President and head of RBCC's Transportation Department, met with Mr. Donoho to discuss the merits of the dispute. Mr. Donoho in essence informed Mr. Nicely that the claim had been denied because it was not on "the list" of approved contracts allowing for an extension to the incentive payment date. Upon further inquiry about this purported "list," Mr. Donoho gave Mr. Nicely copies of a February 24, 2005 letter from TDOT to FHWA, and the response letter from FHWA to TDOT dated March 2, 2005. The substance of the exchange of letters involved a change in policy by FHWA to eliminate the use of the pro-rata method for calculating time extensions when there are quantity overruns on projects with incentive clauses. Mr. Nicely testified that prior to the meeting with Mr. Donoho, he had never heard about the list of approved contracts. However, according to Mr. Donoho's testimony, the matters discussed in the letters provided the basis for TDOT's denial of RBCC's claim.

## THE TDOT LETTER

TDOT's letter was signed by Paul Degges, Chief Engineer for TDOT. It was sent to Bobby Blackmon, Division Administrator for FHWA. The letter sought approval of the pro-rata method for "existing contracts" with TDOT:

> . . . [Pro-rata adjustments have] eliminated the need for processing supplemental agreements for these mostly routine transactions and [have] over the years saved the department and FHWA immeasurable time and expense.
>
> Recently, however, the applicability of the pro rata cost estimation method for establishing contract time has been decided to conflict with FHWA procedures. According to the FHWA guideline, this method "is not recommended for use on projects where completion time is a major factor." It follows that if the method is not appropriate for establishing working time initially, then it should not be used for calculating additional time.
>
> The department is in full agreement with the FHWA guideline looking forward. However, *since this provision is included in practically all of the department's current contracts, we feel that in fairness to both the department and its agents, that the provision should continue [to] be applied in accordance with current practice to existing contracts.* Since this has been the practice for many years now, we do not believe that continuing to do so

-7-

will in any way diminish the integrity of the department's contract administration process. Therefore, FHWA's concurrence and participation is requested on existing contracts as new policy and guidelines are being developed. A list of these projects is attached.

. . . We have recently, and will continue to use contracting methods such as "A + B Bidding" and "No Excuses Bonuses" when appropriate.[8] Guidelines will be developed to help in determining applicable projects for these and other type contracting methods.

To further facilitate these goals, contract specifications and guidelines for setting contract working time are being reviewed. . . . Specifically, on future contracts that contain an incentive/disincentive clause for acceleration of the work, a . . . CPM schedule will be required. In fact, beginning with the February 2005 letting, the department will no longer consider paying incentives on any projects that are not complete by the original contract completion date. In addition, new guidelines for the use of incentives are being discussed.

\* \* \*

(Emphasis added). The list attached to the letter contained ten different projects, including another RBCC project known as "CNA428-Briley [Parkway] Robertson Rd."[9] However, the attached list did not include CNB004 Midtown Interchange Project. At the time the letter was created, the Midtown Interchange Project was an "existing" project.

## THE FHWA LETTER

In the FHWA letter, Mr. Blackmon responded to Mr. Degges' prior letter and approved TDOT's request for use of the pro-rata method on existing contracts:

---

[8]Following the change in policy by FHWA, TDOT began using more restrictive language in its special provisions. For example, TDOT used what is known as a "No Excuse Bonus" provision in Contract No. CND123 in Knox County, which stated that "the NO EXCUSE BONUS Completion date will not be adjusted for any reason, cause or circumstance whatsoever, regardless of fault, save and except in the instance of a catastrophic event (e.g., tornado, earthquake or declared state of emergency)." On another project, Contract No. CNG251 in Jefferson County, the Special Provision expressly stated that "[u]nder no circumstances" would the completion date be extended for consideration of the incentive payment.

[9]In that contract, a pro-rata extension of the incentive data was granted.

On several projects, we have raised concerns about the appropriateness of using Section 108.06 of the Standard Specifications to proportionately increase contract time for quantity overruns on projects with incentive/disincentive provisions for completion. With the changes listed in your letter, future contracts will not allow this approach.

We understand there are active projects with incentive/disincentive clauses whose contracts include Section 108.06 of the Standard Specifications. In addition, we understand that it has been the TDOT's practice on Federal-aid projects to proportionally increase contract time for quantity overruns. ***Therefore, we agree that it is appropriate to honor the use [of] this approach on the projects listed in your letter. On the listed projects, we will approve your requests for a proportionate increase in contract time for quantity overruns and the approved additional time can be used to adjust the incentive/disincentive dates.***

(Emphasis added). According to Mr. Donoho, the Midtown Interchange Project was one of the larger incentive provisions in existence at the time of the policy change.

## BRILEY PARKWAY ROBERTSON ROAD

On RBCC's Briley Parkway Robertson Road Project, included on the list of existing contracts, RBCC had a completion date of November 1, 2005, with incentive/disincentive payments in the amount of $7,500 per day. That contract provided in part:

The project shall be completed in its entirety on or before November 1, 2005.

* * *

. . . The November 1, 2005 completion date may be extended in accordance with the Standard Specifications, however, no incentive payment will be made if work is not completed in its entirety by November 1, 2005.

As to contract time extensions, the above language was exactly the same language as SP108B in the present case, with the exception of the actual completion date.

On the Briley Parkway Robertson Road project however, TDOT executed Change

-9-

Order No. 31, which extended the completion date from November 1, 2005, to April 26, 2006. Of the 177 days added to the contract time, 129 days were for quantity overruns calculated by the pro-rata method. The change order expressly stated that "the original completion date of November 1, 2005 listed in the Special Provision 108(B) will be adjusted to reflect the new completion date of April 26, 2006." TDOT later revised the SP108B to reflect the new completion date. Mr. Donoho testified that all dates in the SP108B, including the incentive payment date, were changed to April 26, 2006, because the Briley Parkway Robertson Road project was included on the list of "existing contracts" approved by FHWA.

## THE "EXISTING CONTRACTS" LIST

Mr. Donoho testified that he assisted Mr. Degges in drafting the February 2005 letter to FHWA, and that his office prepared the list of "existing contracts" attached to TDOT's letter. In their testimony, both Mr. Donoho and Mr. Degges could identify no objective reason for the Midtown Interchange Project not being included on the list. Indeed, Mr. Donoho conceded at trial that it was simply due to "an oversight." However, even after learning about the "oversight," Mr. Degges admitted that he never asked FHWA about moving the incentive date for the Midtown Interchange Project.

Based upon FHWA's March 2005 response to TDOT's February 2005 letter, Mr. Donoho testified that RBCC's claim would have been treated differently by both TDOT and FHWA – a pro-rata extension would have been granted – had the Midtown Interchange Project been included on the attached list of "existing contracts." He acknowledged that prior to the change in policy, the incentive dates could be extended and that TDOT had previously done so in other contracts.

However, as the Commission noted in the decision,

Mr. Donoho admitted that when FHWA advised him that it did not want the incentive date extended on this contract, TDOT looked at the project differently. . . . Specifically, Mr. Egan testified FHWA told him that if the Shelby County project [(Midtown Interchange Project)] was not on the list, they were not going to pay it and if the RBCC Davidson County project [(Briley Parkway Robertson Road)] had the same language, they should not have paid that one. Mr. Egan was afraid that FHWA would re-visit the payment made on the Davidson County project and dropped the issue.

The Commission discussed the integral involvement of FHWA with the administration of the contract:

Mr. Egan testified that when Scottie Plunk with TDOT forwarded proposed Supplemental Agreement 24 to RBCC on March 1, 2006, he and possibly Plunk already had held discussions with FHWA. Mr. Egan went on to testify that when RBCC's claim was presented to FHWA, it responded that it did not know if it would participate or not. According to Mr. Donoho, in 2005, FHWA took the position that the pro-rata method of adding additional days to the completion date was not consistent with its policies. Mr. Donoho testified that this project's incentive was looked at differently because FHWA made TDOT look at it differently although Mr. Egan testified the Federal government "ha[d] approved moving the completion date for incentive and disincentive purposes" on other occasions. Implicitly acknowledging the pro-rata method of extending time, Mr. Donoho wrote to Mr. Clayton at RBCC on January 30, 2007, that use of the method was not automatic "regardless of how this method may have been implemented in the past."

The decision of the Commission continues as follows:

Mr. Donoho testified that on other projects he had been involved with at TDOT on which RBCC was the contractor,[7] RBCC attempted to earn incentives. Mr. Donoho also acknowledged that prior to February of 2005, incentive dates could and had been extended. He acknowledged the similarity between SP108(B) in this Shelby County contract and the same provision in RBCC's Robertson Road/Briley Parkway Project in Davidson County. It will be recalled that the Davidson County contract was entered into on October 1, 2002, with an anticipated completion date of November 1, 2005 – some nine (9) to ten (10) months after the Degges/Blackmon letter exchange of February/March 2005, and that the completion date was later extended to April of 2006, with the consequence that RBCC earned a bonus of two million five hundred thousand dollars ($2,500,000.00).

According to Mr. Degges' testimony, both he and FHWA were concerned about extending a contract time every time there was an over-run on quantities. FHWA was pushing TDOT to establish more concrete completion dates. In fact, Mr. Degges testified that he was being "pushed" by FHWA to "kind of take a stand" and that because of the flexibility TDOT's Specifications gave it, it wanted to start moving forward in its management of contracts. Additionally, Mr. Degges testified that both TDOT and FHWA were trying to

_____

[7]As noted by the Commission, RBCC was carrying out some ten to 20 projects for TDOT at the same time as this one.

get to the point where they would use a CPM on projects in order to make a determination whether contract change impacted the completion date. Mr. Donoho testified that the change in Standard Specification 108.06 requiring use of a CPM in order to earn incentives took effect on March 1, 2006.

The pro-rata adjustment method for extending completion dates was discussed in Chief Engineer Degges' letter to Mr. Blackmon of FHWA. According to that letter, use of pro-rata adjustments allowed TDOT to modify its contracts "based on over-runs and contract quantities." Mr. Donoho testified that this method had been used in the past by TDOT. However, according to Mr. Degges, the pro-rata approach probably ended around the time frame of his correspondence with Mr. Blackmon in February and March of 2005. Mr. Degges testified that the list attached to his letter to Mr. Blackmon was part of an effort to streamline the process and "basically move forward with projects that were either newly let to contract or had not been let to contract yet." According to Mr. Donoho and the language of Mr. Degges' letter, under existing contracts TDOT wanted to continue using the pro-rata method and requested that FHWA concur with that position. Attached to the Degges' letter is a list of "existing contracts" which "in fairness" should continue using the pro-rata or cost estimation method for establishing contract time and then "beginning with the February 2005 letting, the department [would] no longer consider paying incentives on any projects that [were] not complete by the original contract completion dates."

. . . Mr. Egan and Mr. Donoho agreed that if the Shelby County Mid-Town project had been included on th[e] list the incentive would have been paid, and that Mr. Blackmon and Mr. Degges agreed that contracts in existence prior to 2005 would be paid consistent with past practice. There is no evidence in this record explaining why the contract here, containing language identical to five of the contracts listed on Mr. Degges' list, and in place since 2003 was not included on that list.

Mr. Donoho . . . testified that Mr. Blackmon had responded to Mr. Degges that ". . . it is appropriate to honor the use of this approach on the projects listed in your letter." In fact, he testified that there was no objective reason why the Shelby County project had been left off the attached list, and that if it had been there, he would have looked at RBCC's claim differently. In fact, he also stated that the incentive date was changed (extended) on the Davidson County Robertson Road/Briley Parkway project because it was on the list.

* * *

. . . [T]he Commission FINDS that the proof developed over four days of trial establishes clearly that up until February or March of 2005, TDOT and FHWA permitted extensions of completion dates for purposes of earning incentives, even in the face of the language contained in SP108(B).

This case is a strong example of why parol evidence is sometimes admitted in establishing the full intent of parties to a contract.

* * *

Based upon the extensive evidence introduced at the trial of this matter, the Commission FINDS that there was an ambiguity in this contract, based upon both the language and the circumstances surrounding the entering into and performance of the same, created by Standard Specification 108.06 and SP108(B), both of which, according to the terms of the contract, are a part of it and are "complementary."

It is clear that for a number of years, as shown by the Degges/Blackmon correspondence of early 2005, exceptions to the no extension language for incentives found in SP108(B) had been regularly made. Apparently, a watershed change in the way of awarding incentives took place in early 2005 unbeknownst to RBCC, and for that matter, perhaps other contractors, when FHWA decided unanticipated delays and pro-rata quantity increases could not, under its regulations, provide a basis for extending completion dates for purposes of earning an incentive. As a primary provider of funds for large highway construction projects in Tennessee, here, ninety percent (90%), the FHWA obviously was integrally involved with projects such as this one.

According to the testimony, one of the methods involved here to extend the completion dates for purposes of earning an incentive was involved in a small subset of the total set of construction projects overseen by TDOT. RBCC had been the beneficiary of such an extension with regard to the Davidson County, Robertson Road/Briley Parkway project which was entered into on October 1, 2002, with an effective date of November 25, 2002. The originally bargained for completion date was November 1, 2005. However, pursuant to a Supplemental Agreement signed by TDOT's Director of Construction on March 13, 2006, the completion date, for purposes of earning an incentive, was extended to April 26, 2006. As a result of that one hundred seventy-seven

-13-

(177) day extension, RBCC received an incentive bonus of two million five hundred thousand dollars ($2,500,000.00). Mr. Nicely testified that in fact it was TDOT which had taught him how to apply for an extension of the incentive date during the course of the Robertson Road/Briley Parkway project.

The timing of the approval of the extension of the Davidson County project is particularly intriguing since the proposed Supplemental Agreement in this case, SA 24, providing for an extension of the date to avoid a disincentive (but not to earn an incentive), was sent by Mr. Plunk of TDOT to RBCC on March 1, 2006, twelve days before TDOT's Director of Construction signed a Supplemental Agreement extending the completion date for purposes of earning a bonus on the Robertson Road/Briley Parkway project even though the language of SP108(B) in both contracts was virtually the same. This discrepancy in the State's position vis-a-vis these two contracts is difficult and perhaps impossible to logically reconcile.

Therefore, it is clear to the undersigned that based upon TDOT's past practice of extending incentive dates as well as RBCC's recent experience in Davidson County, a fair interpretation of the contract here . . . is that the completion date could be extended not only for avoiding disincentives and liquidated damages but also for purposes of earning the ten thousand dollar ($10,000.00) a day incentive.

The Commission went on to state:

[D]enying RBCC an early completion bonus on this project, delayed as it was by problems at two bridge sites and involving performance of millions of dollars in additional work is both unreasonable and out of sync with the parties' agreement. The proof shows that even as early as March of 2005, RBCC had completed one hundred and two percent (102%) of the original projected work. Further, although the State's position was that throughout the project when RBCC was stymied at one work location it could merely move to another area and complete other aspects of the job, [this] is simply not borne out by the proof. . . .

The State's insistence that RBCC could merely shift its resources to other aspects of the job when problems were encountered is also curious in light of its emphasis – in its own proof – on the schedules developed by RBCC for completing the work, as well as the State's misplaced reliance on a critical

path method, which was not required under this contract. Obviously, the State acknowledges the importance of completing work in a sequential fashion and cannot be heard now to criticize RBCC for seeking more days, pursuant to an established practice for bonus purposes, when it was thrown off schedule by circumstances it did not create.

* * *

. . . [I]n this case, the Commission FINDS that RBCC, TDOT, and FHWA were working under a system that clearly involved payment of bonuses even though the initial completion/incentive date was not met when unanticipated delays and quantity over-runs were encountered.

There may well have been a change in FHWA policy in perhaps late 2004 and early 2005 but this contract was entered into well before that, there is no evidence that the ground rules for interpreting the terms of this contract had changed prior to its effective date.

Accordingly, the Claims Commission concluded that RBCC was entitled to the full relief sought, including an award for the maximum incentive payment ($2,500,000), return of disincentive ($170,000) and liquidated damages ($23,800), compensation for previously unpaid items ($67,819.36), and prejudgment interest. Due to a calculation error, the Claims Commission amended the final judgment on August 7, 2009. TDOT filed a timely notice of appeal, limited solely to the award of the incentive payment of $2,500,000, plus the award of prejudgment interest of $173,618.50 on the incentive payment. TDOT did not appeal any of the other monetary awards in favor of RBCC.

## II. ISSUE

The issue before us is whether the Claims Commission erred in allowing extrinsic evidence to explain what it found to be an "egregious" latent ambiguity in the contract?

## III. STANDARD OF REVIEW

On appeal, the appellate court reviews the Claims Commission's conclusions of law under a de novo standard upon the record with no presumption of correctness. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). The factual findings of the

Commission are presumed to be correct; the appellate courts will not overturn those factual findings unless the evidence preponderates against them. *Skipper v. State*, No. M2009-00022-COA-R3-CV, 2009 WL 2365580, at *2 (Tenn. Ct. App. W.S., July 31, 2009). For the evidence to preponderate against such a finding of fact, it must support another finding of fact with greater convincing effect. *Id.* We accord great deference to the Claims Commission's determinations on matters of witness credibility and will not re-evaluate that assessment in the absence of clear and convincing evidence to the contrary. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) (citations omitted).

## IV.  DISCUSSION

The Commission concluded that the terms of the contract, as well as extraneous facts, presented an "egregious" latent ambiguity in the parties' contract that allowed it to rely on extrinsic evidence to supplement the contract terms. Specifically, the Commission found contract provision SP108B ambiguous for three reasons: (1) the term "original" in SP108B creates an ambiguous circumstance; (2) SP108B cannot be reconciled with Standard Specification 108.06 when applied; and (3) TDOT's past practices make SP108B ambiguous.

TDOT objected to the consideration of extrinsic evidence, arguing that review of the evidence by the Commission violated the parol evidence rule, constituted hearsay, and was not relevant to the proceedings.[8]

The parol evidence rule is a matter of substantive law in contract cases that prevents a party to a written contract from contradicting the terms of the contract by seeking the admission of "extrinsic" evidence. *See, e.g., Maddox v. Webb Constr. Co.*, 562 S.W.2d 198, 201 (Tenn. 1978); *Airline Constr., Inc. v. Barr*, 807 S.W.2d 247, 259 (Tenn. Ct. App. 1990). Ordinarily, parol evidence is inadmissible to add to, vary, or contradict contract language. *Stickley v. Carmichael*, 850 S.W.2d 127, 132 (Tenn. 1992). There are a number of exceptions to the parol evidence rule. In this state, extrinsic evidence can be admitted for the following purposes: (a)  to aid in the interpretation of existing terms or to explain, rather than contradict, the terms of a document, *see Burlison v. United States*, 533 F.3d 419, 429-430 (6th Cir. 2008); *Richland  Country Club, Inc. v. CRC Equities, Inc.*, 832 S.W.2d 554, 558 (Tenn. Ct. App. 1991); (b) to resolve a latent ambiguity in the contract, *Coble Systems, Inc. v. Gifford Co.*, 627 S.W.2d 359 (Tenn. Ct. App. 1981); or (c) to establish allegations of

---

[8]The Claims Commission found that the TDOT and FHWA letters and the contracts involving other TDOT projects were relevant to the issues in dispute and were not inadmissible hearsay under the party-opponent admission, statement against interest, and public record exceptions to the hearsay rule. *See* Tenn. R. Evid. 803(1.2), 803(8), and 804(b)(3).

fraud or fraudulent misrepresentation in the inducement of a contract. *See Brungard v. Caprice Records, Inc.*, 608 S.W.2d 585, 588 (Tenn. Ct. App. 1980); *see also Hines v. Wilcox*, 33 S.W. 914, 915-16 (Tenn. 1896) (listing several other exceptions to the parol evidence rule).

The interpretation of written agreements is a matter of law to be reviewed de novo on the record according no presumption of correctness to the trial court's conclusions of law. *See Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). The cardinal rule of contract interpretation is that the court must attempt to ascertain and give effect to the intention of the parties. *Christenberry v. Tipton*, 160 S.W.3d 487, 494 (Tenn. 2005). In attempting to ascertain the intent of the parties, the court must examine the language of the contract, giving each word its usual, natural, and ordinary meaning. *See Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn. Ct. App. 1996). Additionally, the court may consider the situation of the parties, the business to which the contract relates, the subject matter of the contract, the circumstances surrounding the transaction, and the construction placed on the contract by the parties in carrying out its terms. *See Penske Truck Leasing Co., L.P. v. Huddleston*, 795 S.W.2d 669, 671 (Tenn. 1990); *Minor v. Minor*, 863 S.W.2d 51, 54 (Tenn. Ct. App. 1993).

The court's initial task in construing the contract is to determine whether the language is ambiguous. *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002). A contract is ambiguous if its meaning is uncertain and is susceptible to more than one reasonable interpretation. *See Bonastia v. Berman Bros.*, 914 F.Supp. 1533, 1537 (W.D. Tenn. 1995); *Frank Rudy Heirs Assocs. v. Moore & Assocs., Inc.*, 919 S.W.2d 609, 613 (Tenn. Ct. App. 1995); *Gredig v. Tennessee Farmers Mut. Ins. Co.*, 891 S.W.2d 909, 912 (Tenn. Ct. App. 1994).

A latent ambiguity is found to exist where the words of a written instrument are plain and intelligible, yet have capability of multiple meanings given extraneous facts. *See* 96 C.J.S. *Wills* § 893 (2001). The courts in Tennessee have provided that a latent ambiguity exists when "the equivocality of expression or obscurity of intention does not arise from the words themselves, but from the ambiguous state of extrinsic circumstances to which the words of the instrument refer[.]" *Burchfiel v. First United Methodist Church of Sevierville*, 933 S.W.2d 481, 482 (Tenn. Ct. App. 1996) (quoting *Weatherhead v. Sewell*, 28 Tenn. 272, 295 (1848)). Moreover, a latent ambiguity is "susceptible of explanation by the mere development of extraneous facts, without altering or adding to the written language, or requiring more to be understood thereby than will fairly comport with the ordinary or legal sense of the words and phrases made use of." *Id.*

The Commission focused on three separate provisions in the parties' contract: (1) SP108B; (2) Standard Specification 108.06; and (3) the order of precedence clause in the

standard contract. The Commission noted in the decision as follows:

> The Commission FINDS that there is an egregious ambiguity in these contractual provisions.
>
> SP 108(B) in this contract requires completion of "all work in the original contract" before RBCC could earn an incentive bonus. In fact, there is arguably proof in this record that the originally contemplated work was complete months before December 15, 2006 . . . .
>
> The ambiguity here develops since the order of precedence clause . . . provides clearly that theoretically SP 108(B) would trump Standard Specification 108.06, which provides for extension of the completion date where there are overruns and unanticipated delays in completing that same original work . . . . In other words, Special Provision 108(B) seemingly requires completion of the original work in its entirety but fails to take into account circumstances dealt with in Standard Specification 108.06 which may change the nature and content of that original work for reasons completely out of the control and unanticipated by either the State or the contractor.

The Commission further noted:

> This ambiguity becomes even more confounding in light of the proof here that apparently both TDOT and FHWA had for a number of years extended both incentive and disincentive dates, and agreed to do so again in February of 2005, on a list of "existing" and "active" contracts – a list from which the contract at issue here was inexplicably omitted. . . .
>
> This constellation of ambiguities is further accentuated by the fact that around the time of the completion of this project, RBCC had completed for TDOT another project involving in excess of forty-three million dollars ($43,000,000.00) in Davidson County, containing the exact same language as SP 108(B) here and was granted an extension of the completion date which qualified it for an incentive bonus in excess of two million dollars ($2,000,000.00).
>
> In light of this complex set of circumstances, created not only by the terms of the contract itself but by the circumstances surrounding the implementation of its terms, a definite latent ambiguity exists for which parol evidence not only is admissible, but frankly, absolutely necessary in both understanding and

deciding the issues in this case.

When contractual language is found to be ambiguous, the court must apply established rules of construction to determine the intent of the parties. *Planters Gin Co.*, 78 S.W.3d at 890. Generally, an ambiguous provision in a contract will be construed against the party drafting it. *Hanover Ins. Co. v. Haney*, 425 S.W.2d 590, 592 (Tenn. 1968). When a provision is ambiguous, a court is permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provisions, to guide the court in construing the contract. *See Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611-12 (Tenn. 2006).

There was a sufficient legal basis for the Commission to rely on the two letters, as well as evidence of other TDOT contracts, in order to (1) explain the basis for denial of RBCC's claims; (2) clarify the latent ambiguity; and (3) aid in the interpretation of the contract. The Claims Commission correctly determined that the parol evidence rule did not bar the admissibility or consideration of the TDOT letter, the FHWA letter, or the evidence of the other TDOT projects in this case. The evidence viewed as a whole fully supports the Commission's determination that the extrinsic evidence was "absolutely necessary in both understanding and deciding the issues in this case."

Furthermore, we agree with the Commission's findings that a change in the contract completion date could be applied to the incentive date, as evidenced by the admissions in the TDOT letter, the change of the incentive date on another RBCC project with the exact same language, and examples of both exemplary and prohibitory language in numerous other contracts. As found by the Commission, "the painstaking proof put on by [RBCC] easily establishes that a combination of delay days and quantity over-run days results in an extension of at least two hundred fifty (250) days to be added to the original contract completion date of December 15, 2006 . . . ."

**INTEREST**

On June 2, 2009, the Commission concluded that RBCC was entitled to the relief requested. Thereafter, RBCC was granted prejudgment interest on its award. TDOT argues that RBCC never made a claim for prejudgment interest. Thus, TDOT asserts that RBCC's claim for prejudgment interest is untimely and waived.

However, an award of prejudgment interest is within the sound discretion of the trial court and will not be disturbed absent manifest and palpable abuse of discretion. *See Myint*

*v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). As noted by the Commission

> Prejudgment interest need not have been prayed for in the original complaint in order to be recoverable. *Story v. Lanier*, 166 S.W.3d 167, 181 (Tenn. Ct. App. 2004).

The Tennessee Claims Commission Act also provides in Tenn. Code Ann. § 9-8-307(d) that a successful claimant "shall" receive "such interest as the commissioner may determine to be proper, not exceeding the legal rate as provided for in section 47-14-121."

In the final judgment, the Commission noted:

> According to the clear proof in this matter, the omission of the Memphis Midtown project from this list was a mere oversight within the TDOT bureaucracy. It is clear that had this project been included on the attachment to Mr. Degges' February 24, 2005, letter, this lawsuit in all probability would not have occurred.

> *  *  *

> The interpretation of the contract insisted upon by the Claimant, justifiably held in the view of the Commission, is consistent with FHWA administrator Blackmon's letter to Mr. Degges of March 2, 2005, acknowledging that the existing way of doing business should be "honor[ed]" on those projects identified in the attachment to the Degges' letter from which, the Commission has found, the Memphis Midtown project was unfortunately omitted by error.

> However, FHWA's agreement "to honor" the previous way of doing business apparently abated since eventually Mr. Egan was told by FHWA that if [RBCC's] Davidson County project contract contained the same language as the Midtown Memphis project and the bonus had been paid there, perhaps it should not have been and that conceivably that multi-million dollar payment should be reconsidered. Mr. Egan testified forthrightly that he dropped the entire subject since he was fearful that discussions of the same with FHWA could create problems for both [RBCC] and TDOT on the Davidson County project.

> FHWA's views and input on this issue continued after the Blackmon letter of March of 2005, when the proposed Supplemental Agreement 24 between [RBCC] and TDOT was discussed with FHWA and that agency signaled that

it did not know whether or not it would participate in any incentive payments earned which involved an extension of completion dates.

Mr. Degges testified forthrightly, candidly, and credibly that he believed he was being pushed "by FHWA to take a stand on extension of completion dates as TDOT and FHWA moved toward adoption of a critical path method (CPM) for determining whether contract changes impacted a completion date." In fact, the critical path method became a part of TDOT contracts on March 1, 2006.

This, as well as other proof in the record, leaves the Commission with the very strongly held conviction that the progenitor of this entire dispute was the "silent hand" of FHWA as it pushed, because of its ninety percent (90%) financial leverage on this project, TDOT to change the way it had been doing business with contractors such as [RBCC] since the late 1980's.

To this extent, perhaps it is not TDOT which is the real "proximate cause" of [RBCC's] loss of use of the monies owed as a result of the payment of an incentive bonus but rather FHWA's heavy handed push to change the rules at the end of the game without telling [RBCC] the rules had changed with regard to the contract it had entered into in 2003.

Regardless of where this change in the way of doing business came from [RBCC] did lose for a period of time the use of incentive bonus monies which the Commission has found it was entitled to . . . .

* * *

Here, the Commission is absolutely convinced the driving force in this dispute was the FHWA with its ninety percent (90%) contribution on the project providing a huge amount of leverage over both TDOT and [RBCC]. Some of the indicia of FHWA's heavy hand have been discussed above. It is also worth noting that around the time the dispute in this case was brewing, Mr. Degges had been told by FHWA to try and keep any incentive bonuses at less than ten percent (10%) of the bid proposal. Additionally, Mr. Egan testified that in March of 2006, when S.A. 24 was being prepared, FHWA informed TDOT that it did not know whether or not it would be participating in any payments based on that S.A., implicitly acknowledging, in my opinion, that an incentive bonus was justified in this case. Additionally, Mr. Donoho testified that TDOT began looking at S.A. 24 differently because FHWA made it look at

-21-

that document differently.

This change in policy, clearly dictated by FHWA, had never been revealed to [RBCC] and came to light only when Mr. Donoho honestly and candidly provided Mr. Nicely with RBCC a copy of the February and March 2005, correspondence between Mr. Degges and Mr. Blackmon of FHWA.

It is unfortunate that FHWA imposed on TDOT and its contractor here a change in the manner in which a bonus could be earned. This contract was entered into nearly three years before FHWA, in 2005, proposed changing the fashion in which it had administered contracts with TDOT since the late 1980's and early 1990's.

We find that the Commission properly awarded prejudgment interest to RBCC.

RBCC requested post-judgment interest in the amount of ten percent from the date of June 2, 2009. Tennessee's post-judgment interest statute provides that post-judgment interest "shall be computed at the effective rate of ten percent (10%) per annum" unless otherwise provided. Tenn. Code Ann. § 47-14-121 (Supp. 2010). As the contract at issue is silent on the rate of post-judgment interest, we find RBCC's request to be proper.

# V. CONCLUSION

The judgment is affirmed and the case is remanded to the Commission. Costs of the appeal are taxed to the appellant, State of Tennessee.

_____
JOHN W. McCLARTY, JUDGE

-22-